[No. B108348. Second Dist., Div. Three. Nov. 29, 1999.]

JAMIE SCOTT ENYART, Plaintiff and Respondent, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. The portions not to be published are as follows: footnote 4, as well as part 4.a. through part 4.d. of the Discussion.

COUNSEL

James J. Hahn, City Attorney, Frederick N. Merkin and Edmund E. Fimbres, Assistant City Attorneys; Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro and Louis R. Miller for Defendants and Appellants.

Margolis & Morin and Roger H. Gray for Plaintiff and Respondent.

OPINION

KLEIN, P. J.—Defendants and appellants City of Los Angeles (the City) and Thomas J. Miller (Miller) (sometimes collectively referred to as the City) appeal a judgment in favor of plaintiff and respondent Jamie Scott Enyart (Enyart).

The essential issue presented is whether the trial court abused its discretion in denying the City's motion for new trial.

Because the record establishes there was prejudicial juror misconduct, the judgment must be reversed and the matter remanded for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

On June 4, 1968, Enyart, a 15-year-old boy, went to the Ambassador Hotel in Los Angeles to photograph Senator Robert F. Kennedy's speech following the California Democratic presidential primary. After the speech, Enyart followed Kennedy into a kitchen pantry area and took photographs. As Enyart was taking photographs, he saw Kennedy suddenly twist and fall to the floor. Realizing that Kennedy had been shot, Enyart took more photographs of the events following the shooting.

The Los Angeles Police Department (LAPD) arrived at the hotel after the shooting and detained Enyart and numerous other possible witnesses for questioning. Enyart's film was taken from him and when booked into evidence, the film was misidentified as belonging to a George Clayton. The LAPD released Enyart later that morning after questioning, but retained his film as evidence. Some weeks after the shooting, the LAPD gave Enyart approximately 20 prints of his photographs.

In June 1968, the LAPD formed the Special Unit Senator operation (SUS) to investigate the Senator's assassination. Officers Miller and Shields were

assigned to the SUS and were responsible for handling and logging photographic evidence of the assassination. Enyart's film had been misidentified and was incorrectly listed on the SUS evidence log as belonging to George Clayton. Miller included a handwritten note to identify the film as belonging to Enyart.

The People obtained a conviction against Sirhan B. Sirhan. The LAPD informed Enyart the photographic evidence relating to the assassination would be sealed for 20 years. In 1987, the SUS records were transferred to the California State Archives (the archives) and the files were opened to the public in 1988. Enyart requested return of his property from the archives but the photographs could not be located. In 1989, Enyart commenced this action to recover damages for the loss of his film.

In August 1995, representatives of the City searched the archives and discovered the missing film. The parties then agreed to procedures for the transfer of the negatives and prints from the archives to the Los Angeles Superior Court.

On January 8, 1996, the trial court entered a stipulation and order establishing procedures for transfer of the film from the archives to Los Angeles. On January 10, 1996, Linda Kippen, assistant division chief of the superior court's records management division, rejected an attempted delivery of the film on the ground the delivery was not properly packaged, lacked an inventory list and did not conform to the provisions of the stipulated order. The package was returned to the archives in Sacramento. Nancy Zimmelman, a state archivist, checked the shipment and confirmed that everything had been returned. Zimmelman also had copies made of the negatives and the prints.

On the morning of January 12, 1996, an outside courier picked up the negatives and prints from the archives and flew to Los Angeles to deliver the materials to the superior court. After landing in Los Angeles, the messenger rented a car but had a flat tire shortly after leaving the car rental agency. The messenger pulled into a gas station in Inglewood to call the car rental company for help. As the messenger was calling for help, the briefcase containing the negatives and prints was stolen from the vehicle. Despite the City's investigative efforts and a reward offer for the return of the film, the film was not recovered.

2. *Proceedings.*

On August 14, 1989, Enyart commenced this action against the City. A first amended complaint added Miller as a defendant, and pled various

causes of action, including conversion and breach of contract. The City demurred, contending, inter alia, the action was time-barred. The trial court sustained the City's demurrer to the first amended complaint without leave. Enyart filed a motion for reconsideration, supported by a proposed second amended complaint. The trial court denied reconsideration and Enyart appealed the order of dismissal.

This court reversed, holding the allegations in the proposed second amended complaint were sufficient to withstand a demurrer on statute of limitations grounds because the representations allegedly made by the LAPD that Enyart's film would be returned to him tolled the running of the statute, and whether Enyart exercised reasonable diligence in discovering the fate of his property was a question of fact. The case was remanded to the trial court for further proceedings.

Trial commenced on July 2, 1996. Enyart sought damages based on claims of loan for use, conversion, negligence and negligent spoliation. Jury deliberations began on August 6, 1996.

On August 9, 1996, the trial court received a note from the jury foreperson, Robert Pinger, stating, inter alia, that certain unnamed jurors had discussed the case prior to deliberations and had reached a verdict from which they did not intend to deviate. The City sought a mistrial on grounds of jury misconduct. The trial court denied the motion.

On August 22, 1996, the jury returned a special verdict in favor of Enyart for a total of $450,600, consisting of (1) $299,700 in damages related to the loss of the film; (2) $100,800 in damages for the time and money Enyart spent in attempting to recover his property;[1] and (3) $50,100 in damages for spoliation of evidence.

On October 16, 1996, the City and Miller filed a motion for new trial or in the alternative for remittitur, alleging juror misconduct and other grounds. They also moved for judgment notwithstanding the verdict (JNOV).

The trial court denied the motion for new trial, provided Enyart consented to a $24,000 reduction in the judgment. The trial court ruled that in the event Enyart did not consent to the remittitur of damages, it would order a new trial "on the issue of the damages sustained as a result of the time expended on the conversion cause of action for the efforts of [Enyart] to recover his

---

[1]The measure of damages for wrongful conversion of personal property includes "fair compensation for the time and money properly expended in pursuit of the property." (Civ. Code, § 3336.)

property." The trial court reasoned the jury's award of $100,800 to compensate Enyart for his efforts to locate the film was excessive because, given Enyart's testimony as to the amount of time he spent on those efforts, and Enyart's average hourly earnings, he was only entitled to $76,800. Similarly, the trial court granted the motion for JNOV to the extent that it reduced the $100,800 portion of the judgment to $76,800.

Enyart filed a written consent to the reduction and the trial court then denied the motion for new trial.

On December 11, 1996, the trial court entered a corrected judgment in favor of Enyart and against the City and Miller, jointly and severally, in the amount of $299,700 plus prejudgment interest on that sum of $179,212, plus $76,800; as well as $50,100 in spoliation damages solely against the City. Thus, the total amount awarded was $605,812.

 ██ ██ On December 24, 1996, the City and Miller filed a timely notice of appeal from the corrected judgment.[2] Enyart filed a protective cross-appeal from the corrected judgment, which was dismissed for failure to file an opening brief. (Cal. Rules of Court, rule 17(a).)

## CONTENTIONS

The City and Miller contend: serious jury misconduct requires a new trial; the trial court improperly instructed the jury that seizure of Enyart's film by the LAPD constituted a "loan for use" under Civil Code section 1884; Enyart presented insufficient evidence to support the jury's determination that the City or Miller converted his film; Enyart cannot recover on his spoliation of evidence claims; and the award of prejudgment interest was erroneous.

## DISCUSSION

1. *Establishing juror misconduct for purposes of setting aside a verdict.*

 a. *General principles.*

Preliminarily, we review the principles governing proof of jury misconduct and the evaluation of its prejudicial effect.

---

[2]No appeal lies from the denial of a motion for new trial. Such proceedings are reviewable upon an appeal from the judgment. (*Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 748-749 [137 Cal.Rptr. 417]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 123, p. 188.) Thus, the City and Miller properly appealed from the judgment.

Juror misconduct is one of the specified grounds for granting a new trial. (Code Civ. Proc., § 657, subd. 2.) "Trial by jury is an inviolate right and shall be secured to all . . . ." (Cal. Const., art. I, § 16.) ■ The right to unbiased and unprejudiced jurors is an " ' "inseparable and inalienable part" ' " of the right to jury trial. (*People* v. *Hughes* (1961) 57 Cal.2d 89, 95 [17 Cal.Rptr. 617, 367 P.2d 33].) The guarantee includes the right to 12 impartial jurors. (*Smith* v. *Covell* (1980) 100 Cal.App.3d 947, 955 [161 Cal.Rptr. 377].)

■ Subject to the restrictions of Evidence Code section 1150, a juror's affidavit may be used to impeach a verdict. Evidence Code section 1150 states in relevant part: "(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Evidence Code "section 1150 properly distinguishes between '*proof of overt acts, objectively ascertainable,* and *proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, . . .*' " (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 80 [137 Cal.Rptr. 863, 562 P.2d 1022], italics added.)

In *People* v. *Hutchinson* (1969) 71 Cal.2d 342 [78 Cal.Rptr. 196, 455 P.2d 132], the Supreme Court "approved the admission of jurors' affidavits, for purposes defined and limited by [Evidence Code] section 1150, adding, however, that '[t]he only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses *and thus subject to corroboration.* [Citations.]' [Citation.] [¶] *Hutchinson* involved jurors' affidavits regarding a bailiff's improper statements to the jury, prompting them to reach a premature verdict. Since these remarks were 'likely to have influenced the verdict improperly' (Evid. Code, § 1150, subd. (a)), [*Hutchinson*] vacated the order denying new trial and directed the trial court to redetermine the motion in the light of these affidavits." (*Krouse* v. *Graham*, *supra*, 19 Cal.3d at p. 80, italics added.)

In *Krouse*, in support of the motion for new trial, the "defendant offered the declarations of four jurors to the effect that the verdict for each of the plaintiffs had been increased by an amount the jurors estimated would be paid by plaintiffs in legal fees." (*Krouse* v. *Graham*, *supra*, 19 Cal.3d at p. 79.) The plaintiffs "moved to strike the declarations on the twin grounds that

they contained inadmissible evidence and involved the 'mental processes' of the jurors. The trial court agreed, stating its opinion that such declarations were always to be viewed with distrust since jurors are easily subjected to undue pressure by investigators seeking to impeach a verdict. [The Supreme Court] conclude[d], however, that the declarations were admissible, . . ." (*Id.*, at p. 80.)

Guided by Evidence Code section 1150 and *Hutchinson*, the *Krouse* court reasoned ". . . if the jurors . . . *actually discussed* the subject of attorneys' fees and *specifically agreed* to increase the verdicts to include such fees, such discussion and agreement would appear to constitute matters objectively verifiable, subject to corroboration, and thus conduct which would lie within the scope of [Evidence Code] section 1150." (*Krouse v. Graham, supra*, 19 Cal.3d at pp. 80-81, italics added.) An "express agreement by the jurors to include such fees in their verdict, or extensive discussion evidencing an implied agreement to that effect, constitutes misconduct requiring reversal. [Citations.]" (*Id.*, at p. 81.)

In its analysis, *Krouse* reiterated the distinction between "conduct reflecting only the mental processes of the declarant jurors" or evidence of the jury's " 'subjective reasoning processes' " and " '*overt acts, objectively ascertainable*' *and thus admissible.*" (*Krouse v. Graham, supra*, 19 Cal.3d at p. 81, italics added.) Thus, an "assertion that a juror privately 'considered' a particular matter in arriving at his verdict, would seem to concern a juror's mental processes, and . . . would be inadmissible . . . ." (*Ibid.*)

█ Juror misconduct raises a presumption of prejudice, and unless the prevailing party rebuts the presumption by showing the misconduct was harmless, a new trial should be granted. (*Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1745 [286 Cal.Rptr. 435]; *Andrews v. County of Orange* (1982) 130 Cal.App.3d 944, 954 [182 Cal.Rptr. 176].) This does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside. (*Andrews, supra*, at p. 954.)

b. *Standard of appellate review.*

 ██ In reviewing the trial court's ruling on a motion for new trial, we accept the trial court's credibility determinations if supported by substantial evidence. (*People* v. *Nesler* (1997) 16 Cal.4th 561, 582 [66

Cal.Rptr.2d 454, 941 P.2d 87].)[3] . "Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination. [Citations.]" (16 Cal.4th 582.)

Thus, although the trial court "is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal . . . we are also mindful of the rule that on an appeal from the judgment it is our duty to review all rulings and proceedings involving the merits or affecting the judgment as substantially affecting the rights of a party . . . including an order denying a new trial. In our review of such order denying a new trial, as distinguished from an order granting a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial. [Citations.]" (*City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 871-872 [135 Cal.Rptr. 647, 558 P.2d 545], italics deleted; accord, *Dominguez* v. *Pantalone* (1989) 212 Cal.App.3d 201, 211 [260 Cal.Rptr. 431].) Therefore, where it is reasonably probable that in the absence of misconduct the jury would have arrived at a different verdict, the moving party is entitled to a new trial. (*City of Los Angeles* v. *Decker, supra*, at p. 872.)

### 2. *Evidentiary issues.*

 The motion for new trial was supported by the declarations of five jurors, asserting misconduct by certain majority jurors, including bias and prejudging of the case before deliberations.[4]*

Enyart objected to the declarations in their entirety on various grounds, raising dozens of objections, including hearsay and improper impeachment under Evidence Code section 1150.[5]

The trial court did not make any individual rulings on the evidentiary objections. Instead, the trial court disposed of the objections in their entirety

---

[3]Where, as here, an issue is tried on declarations, the rule on appeal is that those declarations " 'favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom, and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed. [Citation omitted.]' [*Griffith Co.* v. *San Diego Col. for Women* (1955) 45 Cal.2d 501, 508 [289 P.2d 476, 47 A.L.R.2d 1349].]" (*Zirbes* v. *Stratton* (1986) 187 Cal.App.3d 1407, 1412 [232 Cal.Rptr. 653].)

*See footnote, *ante*, page 499.

[5]The hearsay objections were not well taken because the statements in issue were not being offered for the *truth* of the matter stated. (Evid. Code, § 1200, subd. (a).) Statements reflecting on the bias of the jurors who uttered them are not hearsay. (*Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [95 Cal.Rptr. 516, 485 P.2d 1132].)

Further, to the extent the moving declarations set forth evidence of overt acts, objectively ascertainable, as opposed to evidence of the jurors' subjective thought processes, they were admissible under Evidence Code section 1150. (*Krouse* v. *Graham, supra,* 19 Cal.3d at p. 81.)

as follows: "Okay, have a seat. [¶] All right, let's start with the one that you're concerned about, I assume, which is the motion for new trial based upon juror misconduct. I sorted it all out and I don't believe that there's a showing of juror misconduct. You've all asked for some evidentiary objections and I think they're probably well taken. A lot of this is going into the minds of the jurors, which is not appropriate."

Unfortunately, the trial court did not make a proper ruling, giving no guidance to either the parties or to this court as to which objections were sustained and which portions of the declarations were stricken. However, it is evident from the subsequent colloquy at the hearing on the new trial motion that the moving declarations were not stricken in their entirety. Because Enyart did not secure a proper ruling on his objections, for purposes of this appeal we view the objected to evidence as part of the record. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207].)

Consequently, guided by the parameters of Evidence Code section 1150 we examine whether, on this record, the trial court abused its discretion in denying the City's motion for new trial.

### 3. *Concealed bias.*

The concealment of bias by a juror during voir dire constitutes serious misconduct warranting a new trial. (*Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d at pp. 110-111.)

Jurors Karen Bell, Mara Rhone-Key and Ramon Joseph indicated in their jury questionnaires and during voir dire that they did not harbor any negative feelings toward the City or the LAPD and that they could render a fair verdict based solely on the evidence presented at trial. For example, Joseph stated: "I would look at the case based upon the facts and come to a determination based upon the evidence and what I've heard in the courtroom, nothing else." Rhone-Key averred there was nothing about the case that "might cause [her] to think [she] couldn't render a judgment, a decision based on the evidence in this courtroom." Similarly, Bell asserted there was nothing "that would cause [her] to wonder whether [she] could render a fair and impartial decision based on the merits." However, the record establishes these jurors were not impartial.

### a. *The five juror declarations in support of the motion for new trial.*

The declaration of Juror Pinger, who was excused during deliberations for hardship, stated, inter alia: "Certain jurors, including [Rhone-Key], [Bell]

and [Joseph] in particular, expressed extremely negative attitudes, in general, about the city and the police . . . . They expressed and implied . . . that the city/police . . . *regularly and routinely 'screws over' people.*" (Italics added.)

Juror Ward's declaration stated, inter alia: Jurors Rhone-Key, Bell and Joseph, "said the City and LAPD *always hide things and are untruthful,* in their opinion and based on their own life experiences." (Italics added.)

Juror Fernandez-Flygare stated: Certain jurors, especially Rhone-Key and Bell "engaged in long-winded 'speeches' not about the evidence, but rather about such things as how *they 'know,' from their own experience, about the City and the police concealing the facts and hiding the truth and doing wrong.*" (Italics added.)

Juror Arredondo stated: Jurors Rhone-Key, Bell and Joseph attacked jurors who favored the defense and "[n]othing could stop their lengthy tirades expressing how *the city and police are not to be trusted and how the city and police conceal the truth and lie.*" (Italics added.)[6]

Juror Perez stated: Juror "[Joseph] stated during the deliberations that the City and police *always conceal and falsify evidence; he said that they 'screw over' people and are not to be trusted.*" (Italics added.)

b. *Imperfect denials in counterdeclarations.*

Juror Bell flatly denied that she, Joseph or Rhone-Key expressed any negative attitudes toward the City or the LAPD. However, Joseph and Rhone-Key did not deny they displayed such negative attitudes.

Rather, Joseph stated: "Any negative attitudes about the city or police that I heard or stated related to how the evidence in the case substantiated the plaintiff's claims."

Similarly, Rhone-Key asserted: "Any negative attitudes about the city or police that I heard or stated related only to how the evidence in the case substantiated the plaintiff's claims."

Two other jurors who voted with the majority, Vergara and Brady, likewise stated "the negative attitudes about the city or police that I heard related to how the evidence in the case substantiated the plaintiff's claims."

Given the five moving declarations and four of the counterdeclarations, the only reasonable inference to be drawn from this record is that certain of

---

[6]We note that Juror Arredondo had voted with the majority.

the majority jurors had expressed negative attitudes toward the City and the LAPD. On that point, the moving and opposing declarations are in accord. The only question is whether, as the counterdeclarations contended, the negative attitudes were based solely on the evidence in the case, or whether the negative attitudes were the product of bias. We are compelled to conclude the latter is the case. Rather than denying the statements to the effect that the City and the LAPD "routinely" conceal evidence and "screw over" people, there were imperfect denials, asserting that such comments related solely to the evidence presented at trial. However, *generalizations* about the conduct and veracity of City and the LAPD, by definition, are not limited to the evidence adduced at trial. Further, the evidence at trial did not show that the City and the LAPD routinely engage in such misconduct. Hence, it is clear the negative attitudes expressed by certain majority jurors were based on bias. The self-serving assertions that such negative attitudes were merely comments on the evidence at trial must be rejected.

Given the closeness of the verdict and the City's liability for Miller's conduct, bias on the part of any one of the majority-voting jurors is necessarily prejudicial.[7] Accordingly, the presence of a number of jurors biased against the City and the LAPD provides ample support for directing a new trial. On this record, the trial court's refusal to grant a new trial constituted an abuse of discretion.

4. *Remaining issues.*

Because the matter must be retried, we address the remaining issues on appeal to the extent necessary to guide the trial court on remand. (Code Civ. Proc., § 43.)

a.-d.*

. . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed. The trial court is directed to enter judgment in favor of the City and Miller on the conversion claim, and in favor of the City

---

[7]The jury found, inter alia, Miller negligent on a nine-to-three vote, and the City and LAPD negligent on an eleven-to-one vote.

*See footnote, *ante*, page 499.

on the loan for use claim. The matter is remanded for a new trial on the negligence and negligent spoliation claims, in accordance with the principles set forth in this opinion.

The City and Miller are to recover costs on appeal.

Croskey, J., and Aldrich, J., concurred.

A petition for a rehearing was denied December 16, 1999.