[No. B196119. Second Dist., Div. Six. July 21, 2008.]

BANDANA TRADING CO., INC., Plaintiff and Respondent, v. QUALITY INFUSION CARE, INC., Defendant and Appellant.

**COUNSEL**

Mark Yanis for Defendant and Appellant.

Ogden & Fricks, Roy E. Ogden and Sue N. Carrasco for Plaintiff and Respondent.

**OPINION**

**YEGAN, J.**—Jurors are routinely admonished not to form or express an opinion on the case until it is finally submitted to them. However, jurors often form opinions, hopefully tentative, concerning the credibility of witnesses as they are listening to them. This is a natural response consistent with processing information. With such a tentative opinion in mind, a juror should not demonstrably agree with a statement of law argued by counsel premised upon the credibility of a witness. Depending on how aggravated such conduct may be, it may rise to the level of prejudicial misconduct. Here, we conclude that there was no prejudicial misconduct.

 During argument, counsel for respondent told the jury it could reject the entire testimony of a witness if it determined that the witness had been willfully false in one material aspect thereof. (See, e.g., BAJI No. 2.22.)[1] The juror expressed her agreement by clapping her hands. It is not misconduct for a juror to agree with a black-letter principle of law. Jurors are supposed to accept the law as given to them by the trial court. But, given the context, it

---

[1] BAJI No. 2.22: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

was apparent that the juror tentatively believed that one or more of appellant's witnesses had been less than candid. This must have left appellant's counsel with a sinking feeling. Given the juror's explanation and the trial court's expressed appraisal of this conduct, we cannot conclude that the juror should have been excused from the jury.

Quality Infusion Care, Inc. (QIC or appellant), appeals from the judgment, after a jury trial, in favor of respondent Bandana Trading Co., Inc., in this action for breach of contract. QIC contends the trial court erred when it refused to remove a juror for misconduct after the juror applauded by clapping her hands during respondent's rebuttal argument. It further contends it was entitled to a new trial because the same juror committed misconduct during deliberations when she injected technical knowledge into the deliberations, intimidated other jurors and rushed them into a verdict. We affirm.

*Facts and Procedural History*

Appellant purchased large quantities of a prescription medication called Gamunex from respondent, Bandana Trading Inc., which does business under the name CT International. Gamunex is a blood plasma derivative that is used to treat immune deficiencies. Shortages in the plasma supply create shortages in the availability of Gamunex. Appellant began buying Gamunex from respondent in January 2004. It placed its last order in February 2005. Until January 2005, respondent sold Gamunex to appellant on "net 15 days" terms, meaning that payment was due within 15 days of shipment. In practice, respondent allowed its customers an additional 30-day grace period, so that it expected each invoice to be paid in full within 45 days of shipment. Appellant often paid within the 45-day period; it also paid late on several occasions. When appellant had an outstanding invoice that was older than 45 days, respondent would place it on "credit hold," refusing to ship more medication to appellant until the invoice was paid.

On January 21, 2005, appellant informed respondent that it had acquired a large, new client. Serving the new client would require appellant to double its orders of Gamunex. Because the new client paid appellant on a 90-day cycle, appellant asked respondent to agree to 90-day payment terms. Respondent initially offered 60-day terms, which appellant accepted. Appellant sent a check by overnight delivery for its outstanding balance of $77,000 and received a new shipment of Gamunex.

Between February 1, 2005, and February 22, 2005, appellant placed seven orders for Gamunex, creating an outstanding balance of $244,132.76. This was the largest outstanding balance appellant had ever owed to respondent. At the same time, a shortage of Gamunex developed. Respondent received

limited shipments from the manufacturer and decided to give preference to customers that paid their invoices within 15 days. Respondent informed appellant of the new arrangement. None of appellant's outstanding invoices were more than 45 days old. Appellant did not pay them.

Appellant placed its next order in early March. Respondent refused to ship any amount of Gamunex until appellant paid its entire outstanding balance. Appellant offered to send one-half of the balance due. Respondent agreed to accept that payment and promised to fill appellant's order immediately after it received the check. Appellant did not send the check. Respondent did not ship any additional Gamunex to appellant. Appellant obtained a new supplier of the drug. It did not pay respondent its outstanding balance of $244,132.76. Within a few months, appellant's new client began to refer patients elsewhere for their supply of Gamunex.

Respondent sued appellant for breach of contract, to recover the outstanding balance. Appellant cross-complained for interference with prospective business advantage. It alleged that it was forced to find a new supplier of Gamunex because respondent abruptly changed its credit terms and refused to ship Gamunex before it received payment on invoices that were not yet 45 days old. The new supplier could not provide enough product to the new client's patients, so appellant lost that account and with it, $1.5 million in profit.

After a three-day jury trial, counsel presented their closing arguments. During his rebuttal argument, respondent's trial counsel argued that appellant's witnesses were lying about many issues, including the reason it lost the new account. Then counsel read to the jury the standard instruction that, " 'if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.' " At that point, Juror No. 2 applauded by clapping her hands. Respondent's counsel continued his argument without commenting on the juror's applause.

Following a lunch break the trial court and counsel interviewed each juror separately, in an effort to determine the impact of Juror No. 2's applause. When questioned about it, Juror No. 2 explained, "I was pleased with the statement that was read whereas if it was proved that somebody lied on the stand that all of their testimony could be dismissed." Each of the remaining jurors remembered the incident; no one stated that it would impact their impartiality. Jurors found the applause odd, embarrassing or an expression of stress. None could recall the statement that prompted or immediately preceded the clapping.

The trial court declined to remove Juror No. 2. It noted that the conduct was unusual but "no grounds for substitution" because, it concluded, the

incident did not cause any of the jurors to be "influenced or prejudiced." It further found "that the incident in and of itself is not of such a magnitude that it would require automatic removal."

Using a special verdict form that addressed eight causes of action and included 48 separate questions, the jury returned special verdict in favor of respondent and awarded damages of $311,238.43. The trial court inquired whether any of the verdicts had been reached by less than a unanimous vote. The jury foreman indicated that each of the special verdicts had been adopted by a vote of at least 10 to two. The trial court entered judgment on the special verdicts.

Appellant moved for a new trial on the grounds that Juror No. 2's applause during closing argument constituted "irregularity in the proceedings," and that she later engaged in misconduct by intimidating and rushing other jurors to a verdict. The motion was accompanied by the declaration of Juror No. 9, who stated: "From the outset of the deliberations of the jury, one of the other jurors, Juror #2, discouraged me and at least one other juror, Juror #1 from asking questions regarding the issues in the case. Juror #2 was physically confrontation [sic], putting her face very close to me, speaking very loudly and pounding on the table. I observed her do the same thing to Juror #1 when she questioned something about the case." Juror No. 9 further declared that Juror No. 2 "referred to her own expertise in accounting to support her arguments to the jurors. I recall her making reference to a practice in accounting called 'short pay' during the deliberations, and asking me if I was familiar with the term because I had an accounting background." The trial court denied the motion.

### Juror Misconduct During Argument

We review the record independently to determine "whether the act of jury misconduct, if it occurred, was prejudicial to appellant's right to a fair trial . . . ." (*English v. Lin* (1994) 26 Cal.App.4th 1358, 1368 [31 Cal.Rptr.2d 906].) A presumption of prejudice arises from serious juror misconduct. (*People v. Holloway* (2004) 33 Cal.4th 96, 124–125 [14 Cal.Rptr.3d 212, 91 P.3d 164].) "Prejudice exists if it is reasonably probable that a result more favorable to the complaining party would have been achieved in the absence of the misconduct." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 415 [185 Cal.Rptr. 654, 650 P.2d 1171].) "This does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside." (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507 [90 Cal.Rptr.2d 502].)

 Here, the clapping was tantamount to the formation of an opinion as to the credibility of a witness. This was technical misconduct. But as did the trial court, we conclude that it was not prejudicial to appellant. This momentary display occurred after all the evidence had been heard and the closing arguments were nearly completed. Juror No. 2 testified that she applauded because she agreed with counsel's statement that the testimony of a witness who lied could be disregarded. The applause, by itself, does not indicate that Juror No. 2 had unfairly prejudged the witnesses' credibility or that she was unwilling to consider other jurors' points of view. Moreover, there is no evidence the applause impacted the jury's deliberations in any way. Other jurors testified that they recalled the clapping, but not the statement that preceded it. This is, we conclude, the sort of "insignificant infraction" referred to in *Enyart v. City of Los Angeles, supra*, 76 Cal.App.4th at page 507, that did not prevent either party from having a fair trial and does not provide a basis for setting aside the verdict.

 "The jury system is fundamentally human, which is both a strength and a weakness. . . . Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every juror during the course of a trial is unrealistic." (*In re Carpenter* (1995) 9 Cal.4th 634, 654–655 [38 Cal.Rptr.2d 665, 889 P.2d 985], citation omitted.)

### Juror Misconduct During Deliberations

For similar reasons, we reject the contention that appellant was entitled to a new trial based on alleged misconduct during deliberations. Juror No. 9 stated in her declaration that Juror No. 2 discouraged other jurors from asking questions, intimidated other jurors by rushing them to complete the special verdict form, and "referred to her own expertise in accounting to support her arguments . . . ." This conduct does not rise to the level of prejudicial misconduct. (*Enyart v. City of Los Angeles, supra*, 76 Cal.App.4th at p. 507.)

 A jury verdict cannot be impeached by evidence of the jurors' mental processes and reasoning, or by evidence that the jury failed to make findings on some matters. (Evid. Code, § 1150; *Krouse v. Graham* (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022]; *Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905, 909 [64 Cal.Rptr.2d 492]; *Silverhart v. Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1029 [98 Cal.Rptr. 187].) The declaration of Juror No. 9 falls within this category because it states that jurors failed to vote on some issues, were discouraged from asking questions, and were rushed into deciding on a verdict. It was properly disregarded.

■ The conduct of Juror No. 2 in referring to her accounting expertise also does not rise to the level of prejudicial misconduct. Jurors are entitled to rely on their general knowledge and experience in evaluating the evidence. (*In re Malone* (1996) 12 Cal.4th 935, 963 [50 Cal.Rptr.2d 281, 911 P.2d 468]; *English v. Lin, supra*, 26 Cal.App.4th at pp. 1366–1367.) Juror No. 9 provided no evidence that Juror No. 2 decided the case based on extraneous information.

## Conclusion

The judgment is affirmed. Costs to respondent.

Gilbert, P. J., and Coffee, J., concurred.