Filed 10/19/20  Armstrong v. Burnstan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NANCY ARMSTRONG,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALEXIS BURNSTAN et al.,<br><br>    Defendants and Appellants. | D074386<br><br><br>(Super. Ct. No. 37-2016 00041216-CU-PA-NC) |

APPEAL from an order of the Superior Court of San Diego County, Timothy M. Casserly, Judge.  Affirmed.

Niddrie Addams Fuller Singh and John S. Addams; Konoske Akiyama & Brust and Douglas V. Brust for Defendants and Appellants.

Dordick Law Corporation, Gary A. Dordick, John Upton; Sahhar Law Firm and John F. Sahhar for Plaintiff and Respondent.

Plaintiff Nancy Armstrong was involved in a two-vehicle collision with defendant Alexis Burnstan at an intersection controlled by a traffic light. Armstrong filed an action for motor vehicle negligence seeking damages for personal injuries and property damage against defendant Burnstan and her

grandfather Rowland Burnstan, the owner of the vehicle Burnstan was driving.[1] The case was tried to a jury and both Armstrong and Burnstan testified that they had a green light when they entered the intersection. The jury voted 10-2 that Burnstan was not negligent. After the court entered judgment in defendants' favor, Armstrong filed a motion for a new trial. The court granted the motion on the ground of juror misconduct.

Defendants appeal from the order granting a new trial.[2] They contend that the trial court erred in finding juror misconduct, and that even if there was juror misconduct, it was not prejudicial. We conclude the court did not abuse its discretion in deciding a new trial was warranted based on prejudicial juror misconduct and, accordingly, affirm the order granting a new trial.

FACTUAL AND PROCEDURAL BACKGROUND

The automobile accident giving rise to this action occurred on December 11, 2014, at about 9:40 p.m. at the intersection of La Costa Avenue and Saxony Road in Carlsbad, California. The intersection is a "T" intersection, meaning northbound Saxony Road ends where it meets La Costa Avenue, which runs east-west and is the top of the T. There is a left turn lane on Saxony Road for vehicles turning onto westbound La Costa Avenue and a right turn lane for vehicles turning onto eastbound La Costa Avenue. The intersection is controlled by signal lights that change from green to

---

[1]    Rowland Burnstan passed away in January 2020. His daughter Lynn Burnstan is the representative of his estate and has substituted as a party in his place. We will refer to Alexis Burnstan as Burnstan and to her and Lynn Burnstan collectively as defendants.

[2]    Armstrong filed a timely notice of appeal from the judgment, but has informed the court in her respondent's brief that she has abandoned her appeal.

yellow to red. There is a green light with a green turn arrow for westbound La Costa Avenue, a green light for eastbound La Costa, and a green light for turning either right or left from Saxony Road onto La Costa Avenue.

The signal for cars turning onto La Costa Avenue from Saxony Road is an "on-demand" signal, which means the lights facing the traffic on La Costa Avenue remain green until a northbound vehicle on Saxony Road pulls up to the intersection. When a northbound vehicle on Saxony Road stops at the intersection, it "demands" a green light and the light facing Saxony Road eventually changes to green. It can take up to 60 seconds for the light to change, depending on how much traffic is going through the intersection on La Costa Avenue.

Moments before the accident, Armstrong was driving her car eastbound on La Costa Avenue west of the intersection with Saxony Road and Burnstan was driving northbound on Saxony Road. La Costa Avenue has two lanes going each direction and Armstrong was driving in the "No. 1" or fast lane, which is the lane closest to the road's center divide.

At trial, Armstrong testified that she had the green light when she entered the intersection just before the collision. Burnstan testified that when she approached the La Costa Avenue intersection the light was red so she came to a stop. When the light turned green, she entered the intersection to turn left onto La Costa Avenue and collided with Armstrong's vehicle. She did not look in either direction for traffic before she entered the intersection; she "was just looking ahead at the light."

Carlsbad Police Officer Bret Cosgrove investigated the accident and prepared a traffic collision report. The accident stood out in his mind, in part because Burnstan told him at the scene that she was unsure whether her light was red or green when she entered the intersection, which struck him

as odd and unusual.  He wrote in his police report:  "[Burnstan] stated that she was stopped at a red light, facing northbound on Saxony Road at the intersection of La Costa Avenue.  [Burnstan] stated that she entered the intersection to make a left turn from northbound Saxony Road to westbound La Costa Avenue.  [Burnstan] stated she then collided with [Armstrong], who was traveling eastbound on La Costa Avenue proceeding straight to the intersection of Saxony Road.  [Burnstan] stated she is not sure if her light was red or green when . . . she entered the intersection."

Cosgrove further reported that Armstrong "stated she was traveling eastbound on La Costa Avenue, proceeding straight towards the intersection of Saxony Road.  [Armstrong] stated her light was green to proceed straight through the intersection.  [Armstrong] stated that [Burnstan] pulled out in front of her as she entered the intersection and the two vehicles collided."

At trial, the court read to the jury Burnstan's response to a request for admission (RFA) propounded during discovery after instructing the jury that when a party admits a fact stated in an RFA, the fact is conclusively established.  The RFA stated:  "Admit that after the collision, you told the investigating police officer that, when you entered the intersection, just prior to the collision, you did not know the color of the traffic signal light."  Burnstan's response stated:  "Admit that I told one officer that I did not know the color of the traffic signal light.  However, I admit telling one other officer before that that I knew the light was green when I entered the intersection."

Burnstan testified at trial that four different police officers at the scene of the accident asked her what color the light was when she entered the intersection and she told all of the officers that it was green.  She further testified:  "But one of the officers, I recall, asked me, if they did ask me, what was the color at the time of the collision or anything like that.  And I did not

4

know. [¶] And so I was like, 'I have no idea.' I don't know what color the light was when I got impacted because I wasn't looking at it, and I guess I was overthinking the question."

Both sides called an accident reconstruction expert to testify at trial. Armstrong's expert Ted Kobayashi testified that Armstrong's speed at the time of the collision was about 47 miles per hour and Burnstan's speed at impact was 16 miles per hour. Kobayashi could not determine whether Burnstan stopped at the intersection or whether she was accelerating or decelerating at the time of the collision. Based on the traffic signal sequencing, Burnstan's speed, and the damage to the two vehicles and their points of rest, Kobayashi opined that Burnstan most likely entered the intersection on a red light.

Defendants' expert Gerald Bretting testified that he could not determine the color of the light at the time of the accident. He testified that the speed and angle of impact of Burnstan's vehicle was consistent with Burnstan's having stopped at the light before entering the intersection, although it was not inconsistent with her running the light. He opined that "it would be inconsistent for a vehicle that stops for a red light to then run that red light. It's much more consistent for somebody just to run a red light. But if you stop and there's no vehicles around you that start to move, there's no reason for you to move until it turns green." Defense counsel asked Bretting to assume Burnstan was stopped at the light intending to turn left onto westbound La Costa Avenue, that Armstrong was travelling in the No. 1 lane with no traffic in front of her or coming toward her,[3] and that "it

---

[3]     Armstrong testified that there were no vehicles in front of her or coming in the opposite direction just before the accident.

5

started" (presumably Burnstan's demand for a green light) when Armstrong was 800 feet from the intersection. Based on that hypothetical, Bretting opined that "most probably [Burnstan] had a green light[.]"

There was evidence presented at trial that Armstrong suffered substantial injuries as a result of the accident. Armstrong's counsel asked the jury to award her $2,160,635 to support her life care plan, $2.5 million for past pain and suffering, and $5.5 million for future pain and suffering. Defendants' counsel argued that if the jury found Burnstan was responsible for the accident, a reasonable award to Armstrong would be $350,000 for future medical care and treatment and $500,000 for past and future noneconomic damages.

On the second day of jury deliberations, the jury sent a note to the court stating it was unable to reach an agreement of at least nine jurors on question No. 1 on the verdict form—whether Burnstan was negligent. The court encouraged the jury to continue deliberating and "take another crack at [reaching a verdict]." The jury continued deliberating and the next day returned a verdict finding Burnstan was not negligent by a vote of 10-2. The court entered judgment on the verdict in defendants' favor.

*Motion for new trial*

Armstrong filed a notice of intent to move for a new trial on all of the statutory grounds listed in Code of Civil Procedure section 657. In her memorandum of points and authorities in support of her motion for new trial, Armstrong sought a new trial on three grounds: (1) the court committed a prejudicial error of law by excluding evidence of Burnstan's emotional state at the time of the accident; (2) serious juror misconduct tainted the verdict; and (3) the evidence was insufficient to support the defense verdict.

6

Based on the declarations of Juror No. 3 and Juror No. 10, Armstrong claimed that prejudicial juror misconduct occurred in a number of ways. She claimed that a number of jurors expressed concern throughout the deliberations about the effect of a large judgment against Burnstan and that jurors discussed how Burnstan would pay the judgment and whether it would be a burden or "ruin her life at such a young age." Juror No. 3's declaration quoted a juror as stating: "I have two daughters and I wouldn't want them to be burdened with a high award verdict like this. I have to use logic and my feelings to decide this, so, I really can't burden [Burnstan] with a high award against her and ruin her life." Juror No. 10's declaration also reported a juror's statement to that effect. The court overruled defendants' objections to the portions of Juror No. 3's and Juror No. 10's declarations that recounted those statements.

Armstrong also claimed that juror misconduct occurred in the form of the jury's consideration of outside evidence when a juror stated that he was in a serious accident when he was 19 years old and did not remember what he told police officers and emergency personnel. Based on that experience, the juror said that Burnstan probably did not know what she was saying at the accident scene. Other jurors expressed agreement based on their own past experiences of trauma.

Additional misconduct allegedly occurred when the same juror said that like Armstrong, he takes thyroid medication and that he becomes very tired when he forgets to take it. He speculated that Armstrong possibly may have neglected to take her medication and, as a result, ran the red light because she was tired. Finally, Armstrong contended the jury's improper consideration of outside evidence included a discussion that Armstrong might

7

not use an award of damages because of her Christian Science religious beliefs.

The court granted Armstrong's motion for new trial on the ground of juror misconduct.[4] The court found credible Juror No. 3's and Juror No. 10's averments that one or more jurors made statements to the effect that, in the court's words, "awarding a large amount against a young defendant like Defendant Burnstan would effectively 'ruin her life' because she would not be able to pay the judgment." The court found "[t]he jury's discussion . . . of Defendant Burnstan's ability to pay was improper." The court noted the juror misconduct gave rise to a rebuttable presumption of prejudice and concluded: "Defendant Burnstan has been unable to rebut that presumption. As such, the jury misconduct of considering the issue of ability to pay warrants a new trial."

The court specifically found juror misconduct during deliberations in the form of failure to follow the law as instructed. The court stated in its order: "The jury was instructed not to be biased in favor of or against any party because of age. . . . There is evidence that the jury considered the 'burden on this *young* girl' and that one juror would not have wanted his teenage daughters to be burdened with a large award. (Decl. of Juror No. 3, ¶¶ 4-5 (emphasis added); Decl. of Juror No. 10, ¶ 5.) As above, this fact shows misconduct, which gives rise to a rebuttable presumption of prejudice, and Defendant Burnstan has failed to rebut that presumption."

The court also found juror misconduct during voir dire in the form of concealment of bias against imposing large awards of damages on young

---

4    The trial court rejected Armstrong's arguments that it erroneously excluded evidence of Burnstan's emotional state at the time of the accident and that there was insufficient evidence to support the verdict.

people. The court noted that "even an *unintentional* bias can be grounds for a finding of misconduct." The court further noted that whether a juror's intentional or unintentional bias constitutes good cause for the court to find the juror is unable to perform his or her duty is a matter within the court's discretion. The court ruled: "Considering factors like age and ability to pay, as well as the failure to follow the law as instructed with regard to age bias, the [c]ourt finds that the unintentional concealment of bias against imposing large verdicts against young defendants warrants a new trial, particularly in light of the close evidence in this case, which is addressed below."

The court then discussed the closeness of the evidence on liability in the context of addressing Armstrong's claim that the evidence was insufficient to support the verdict. The court specifically addressed Burnstan's admission in her response to an RFA that she told an officer at the accident scene she did not know the color of the traffic light when she entered the intersection. The court observed that "[w]hile the rules regarding admissions in discovery conclusively establish that Defendant Burnstan told one officer that she did not know the color of the traffic signal, it does not conclusively establish the ultimate fact at issue—whether the light was, in fact, red at the time Defendant Burnstan entered the intersection. A myriad of interpretations can be drawn from this friction. On the one hand, this friction could seriously cloud Defendant Burnstan's credibility, as a finder of fact could take the view that the conflict between Defendant Burnstan's testimony and her admission was a selfish, calculated, and deceptive lie to avoid liability. On the other hand, a finder of fact could also take the view that a young person, in the shock and trauma of the moments immediately following an accident, was totally unable to accurately recall the event she had just been through. While the former view could tend to make it more

9

likely than not that the light was red, the latter view would offer no guidance on that ultimate question—leaving it open to be resolved via reference to the other evidence."   The court concluded that defense expert testimony regarding the accident was sufficient to support the jury's finding, noting "the burden was on [Armstrong] to *prove*, by a preponderance of the evidence, that Defendant Burnstan acted negligently—i.e. that Defendant Burnstan ran a red light."   However, the court added:  "Ultimately, the closeness of the evidence in this case *exacerbates* and *magnifies* the jury misconduct described above.  For this reason, and with an eye toward ensuring a fair trial and that justice is achieved, the [c]ourt exercises its discretion to grant Plaintiff's motion for a new trial."

DISCUSSION

Defendants contend the trial court erred in ordering a new trial on the ground of juror misconduct.  Specifically, they contend that the court erred in finding juror misconduct based on the sympathy for Burnstan that some jurors expressed, and that even if juror misconduct occurred, the court erred in finding it was prejudicial.

*Applicable legal principles*

"Juror misconduct is one of the specified grounds for granting a new trial.  (Code Civ. Proc., § 657, subd. 2.)  'Trial by jury is an inviolate right and shall be secured to all. . . .'  (Cal. Const., art. I, § 16.)  The right to unbiased and unprejudiced jurors is an ' " 'inseparable and inalienable part' " ' of the right to jury trial.  [Citation.]  The guarantee includes the right to 12 impartial jurors."  (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 506 (*Enyart*).)  "An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing

10

to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 294.)

We review an order granting or denying a motion for new trial for abuse of discretion. (*Jiminez v. Sears* (1971) 4 Cal.3d 379, 387.) " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

In light of that highly deferential standard of review, " 'juror misconduct is an area in which . . . broad discretion is accorded to the trial judge. [Citation.] . . . "The trial judge is familiar with the evidence, witnesses and proceedings, and is therefore in the best position to determine whether, in view of all the circumstances, justice demands a retrial. Where error or some other ground is established, [the trial court's] discretion in granting a new trial is seldom reversed. The presumptions on appeal are in favor of the order, and the appellate court does not independently redetermine the question whether an error was prejudicial, or some other ground was compelling. Review is limited to the inquiry whether there was any support for the trial judge's ruling, and the order will be reversed only on a strong affirmative showing of abuse of discretion." [Citation.]' [Citation.] (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 159 (*Whitlock*).)

"Courts have also stated the rule for reviewing the order granting a new trial as follows: ' " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed

11

unless a manifest and unmistakable abuse of discretion clearly appears. *This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter.* So long as a reasonable *or even fairly debatable* justification under the law is shown for the order granting the new trial, the order will not be set aside. [Citations.]' [Citation.]" ' [Citation.] ' " 'This court makes all presumptions in favor of the order as against the verdict, and [will] . . . reverse only if manifest abuse of discretion is shown.' " [Citations.]' [Citation.] ' "[T]he affidavits in behalf of the prevailing party are deemed not only to establish the facts directly stated therein, but all facts reasonably inferred from those stated." [Citation.]' [Citation.] And it is the trial court that must assess the credibility of affiants or declarants, and the trial court is entitled to believe one over the other. [¶] Moreover, our review for abuse of discretion extends to *all aspects of the trial court's order granting a new trial*, including the trial court's prejudice ruling." (*Whitlock, supra*, 160 Cal.App.4th at pp. 159-160, italics added.)

" 'In ruling on a request for a new trial based on jury misconduct, the trial court must undertake a three-step inquiry. [Citation.] First, it must determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.) If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.] Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial." [Citation.] . . . 'A trial court has broad discretion in ruling on each of these issues, and its rulings will not be disturbed absent a clear abuse of discretion.' " (*Whitlock, supra*, 160 Cal.App.4th at p.160; *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885 ["[w]e review a trial court's decision to admit or exclude evidence under the abuse of discretion standard"].)

Evidence Code section 1150, subdivision (a) provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." "[S]ection 1150 properly distinguishes between 'proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved[.]' " (*Krouse v. Graham* (1977) 19 Cal.3d 59, 80.) " 'The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' " (*Ibid.*) Thus, "to the extent [juror] declarations set forth evidence of overt acts, objectively ascertainable, as opposed to evidence of the jurors' subjective thought processes, they [are] admissible under Evidence Code section 1150." (*Enyart, supra*, 76 Cal.App.4th at p. 508, fn. 5.)

" 'A showing of misconduct creates a presumption of prejudice.' [Citation.] This presumption may be rebutted by ' "an affirmative evidentiary showing that prejudice does not exist" ' based upon a consideration of such factors as ' "the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." [Citation.]' However, . . . on review of an order granting a new trial, the standard of review with respect to prejudice is abuse of discretion. [Citation.] Further, '[s]ince the trial judge had all the evidence before him [or her] on the merits

13

of the case, and as well the . . . affidavits, [the judge] was in the best position to evaluate the prejudicial effect of the alleged misconduct.' " (*Whitlock*, *supra*, 160 Cal.App.4th at p. 162.)

*Analysis*

Bearing in mind the foregoing well-established principles, we find no abuse of discretion warranting reversal of the trial court's order granting a new trial. The court's rulings on the admissibility of the various statements in Juror No. 3's and Juror No. 10's declarations in support of the motion for new trial were well within its discretion. Specifically, the court did not abuse its discretion in overruling defendants' objections to statements in the declarations that jurors expressed concern throughout the deliberations about the effect of a large judgment against Burnstan and that a juror stated he had two daughters and would not want them to be burdened with a high award like the one Armstrong sought in this case. The court reasonably ruled that these statements were admissible under Evidence Code section 1150 as evidence of observable events or discussion of improper matters, and the court was entitled to find them credible and believe them over contrary statements in the juror declarations that defendants presented. (*Whitlock*, *supra*, 160 Cal.App.4th at pp. 159-160.)

The court also acted within the bounds of reason in determining that the statements reflecting bias against burdening a young defendant with a large award of damages constituted juror misconduct in the form of failure to follow the law as instructed and bias concealed during voir dire. Although the record indicates that the juror identified in Juror No. 3's and Juror No. 10's declarations as the juror who stated he had two teenage daughters actually did not have any daughters, Juror No. 3 stated that "*[t]hrough-out* [*sic*] *the deliberations* there was . . . discussion about the effect of a large

14

judgment on the defendant and how she would pay the judgment and whether this would ruin her life at such a young age[,]" (italics added) and that "[a]t least one juror said, "Money will be a burden on this young girl and we do not want to do this to her." Thus, although the identity of the actual jurors who expressed bias against burdening Burnstan with a large award may have been unclear, the court could reasonably find that juror comments reflecting such bias were in fact made.

Nor do we find a clear abuse of discretion in the court's determination that these improper juror statements were prejudicial—i.e., that they deprived Armstrong of her right to a fair trial. Before reaching its verdict, the jury reached an impasse during deliberations with seven jurors voting that defendant Burnstan was not negligent—i.e., that she did not run a red light—and five voting the opposite—i.e., that she did run a red light. The court could reasonably find that juror statements about not wanting to burden Burnstan with a large verdict likely influenced three jurors to change their vote to finding that Burnstan was not negligent, in addition to influencing other jurors to vote in Burnstan's favor, and, accordingly, the defense verdict was substantially based on jurors' reluctance to burden a young defendant with a large award rather than on the evidence presented at trial.

The court reasonably concluded that a new trial based on juror misconduct was particularly warranted in light of the closeness of the evidence on liability, stating "the closeness of the evidence in this case *exacerbates* and *magnifies* the jury misconduct . . . ." As noted, the court also stated that "the unintentional concealment of bias against imposing large verdicts against young defendants warrants a new trial, particularly in light of the close evidence in this case . . . ."

15

The court's focus on the closeness of the evidence suggests that the court may have thought the evidence preponderated in Armstrong's favor on the issue of liability, but the court concluded, perhaps reluctantly, that there was sufficient evidence supporting the defense verdict to preclude it from exercising its discretion as the "thirteenth juror" to grant a new trial based on insufficiency of the evidence to support the verdict. Although the court acted within its discretion in denying a new trial on the ground of insufficiency of the evidence, it also acted within its discretion in viewing the closeness of the evidence as a factor weighing in favor of granting a new trial based on juror misconduct. (See *Enyart*, *supra*, 76 Cal.App.4th at pp. 499, 511 ["Given the closeness of the verdict and the City's liability for [a police officer's] conduct, bias on the part of any one of the majority-voting jurors is necessarily prejudicial."], fn. omitted.) We conclude the trial court did not abuse its

discretion in determining that a new trial was warranted based on prejudicial juror misconduct.[5]

_____

[5]    Armstrong argues in her respondent's brief that the court erroneously excluded evidence of additional acts of juror misconduct and requests that we review those claims of error and find that the excluded evidence provides additional support for the court's order granting a new trial on the ground of juror misconduct.  Although Armstrong does not cite any authority for seeking review of her claims of error even though she prevailed below and is the respondent on appeal, Code of Civil Procedure section 906 authorizes such review, stating that "[t]he respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review any of the foregoing matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken."  "[T]he exception in Code of Civil Procedure section 906 [to the rule that a respondent may not assert error] applies where a respondent asserts an alternate legal theory upon which the judgment may be affirmed, notwithstanding the court's resolution of the appellant's contentions in the appellant's favor." (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 586.)

In light of our conclusion that the trial court did not err in granting Armstrong's motion for new trial for the reasons stated in its order, it is unnecessary to review Armstrong's claims of error.  In any event, we find no abuse of discretion in the court's rejection of Armstrong's other theories of juror misconduct either on the ground that the evidence of the allegedly improper juror statements was inadmissible or on the ground that the excluded statements did not constitute prejudicial misconduct.  We note that although the court sustained evidentiary objections to statements in the juror declarations regarding comments that Armstrong might not pursue medical treatment because of her Christian Science religion and that she may have run a red light because she neglected to take her thyroid medication, the court in its order granting a new trial nevertheless addressed the merits of Armstrong's juror misconduct claims based on the excluded statements.

## DISPOSITION

The order granting Armstrong's motion for a new trial is affirmed. Armstrong shall recover her costs on appeal.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.