Filed 9/22/14  Metros v. Chowdhary CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| FRED METROS, | D065269 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVDS-901250) |
| HARDIP SINGH CHOWDHARY, SR., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, David A. Williams, Judge.  Affirmed.

Alder Law, Scott Spell; Carlson & Johnson, Steven F. Carlson for Plaintiff and Appellant.

Gilbert, Kelly, Crowley & Jennett, Peter J. Godfrey, Andrew C. Hubert for Defendant and Respondent.

Plaintiff and appellant Fred Metros appeals from a judgment entered on a jury's special verdict following a trial on his complaint for personal injuries arising from a traffic collision involving Metros and Hardip Singh Chowdhary, Sr.  Chowdhary

admitted liability, and following a trial on damages, the jury found Chowdhary's negligence was a substantial factor in causing Metros harm but that Metros had suffered no damages on his claims for future medical expenses and past and future pain and suffering. Metros contends: (1) the jury's award of zero damages was inadequate as a matter of law; (2) the trial court erred by denying his motion for new trial based on juror misconduct; and (3) the trial court improperly excluded testimony of Metros's neurologist expert on causation of his orthopedic injuries. Metros maintains the errors resulted in a miscarriage of justice.

We conclude the facts of this case, which were highly contested, do not lead to an inescapable conclusion that Metros was entitled to an award of future medical expenses or noneconomic damages for past and future pain and suffering, and thus the jury's award was not inadequate as a matter of law. We further conclude the trial court did not err by denying Metros's new trial motion or excluding portions of his expert's testimony on causation. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We view the evidence in the light most favorable to the judgment, accepting as true all evidence tending to support it. (See *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 61; *Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1278, fn. 1.)

Metros and Chowdhary were involved in an automobile collision on November 8, 2007, after Chowdhary attempted to make a left turn in front of Metros's vehicle. At the moment of impact, Metros was travelling 28 to 30 miles per hour, and Chowdhary was moving between 11 and 14 miles per hour. Chowdhary's airbag deployed but Metros's

2

did not.  One witness to the accident ran up to Metros's vehicle to find Metros with his eyes closed and his head slumped to his shoulder.  Another witness parked her car and returned to Metros's car four or five minutes after the collision; she found Metros in his car looking pale and asked him if he was okay.  Metros responded to the effect of, "I think I'm okay, but my shoulder and my arm hurt."  He indicated his left shoulder.  That witness testified Metros looked confused and disoriented, "kind of looking like the moment was not good for him."  An ambulance arrived five to ten minutes later and attendants helped Metros out of the car.  While in the ambulance, Metros heard a police officer and an emergency medical worker at the scene debate over whether his driver's license was expired; he was able to recount their conversation in detail in his later deposition.

Emergency room records from immediately after the accident indicated Metros complained of right head pain, right hip pain and left shoulder pain.  The notes reflected he had an artificial right hip and was already taking an anti-inflammatory medication.  A neurologic examination showed Metros was alert and oriented times four, without head trauma.  There were no notes indicating Metros had struck his head or face, or that there was damage to his jaw or temporomandibular joint.  The hospital records indicated "negative" for any loss of consciousness.  Hospital personnel wrote that Metros had "excellent recollection of all the details of the accident."  X-rays of Metros's left shoulder after the accident were normal, and an examination of Metros's scalp was also within normal limits, without any sign of external injury.

3

Metros sued Chowdhary for personal injuries. Chowdhary admitted liability and the matter proceeded to trial solely on the issue of damages.

The trial evidence was undisputed that Metros had significant preexisting medical conditions and multiple surgeries before the accident. In 1982, Metros was hit while riding his motorcycle and run over, causing nerve damage to his right leg and a permanent condition of "drop foot," i.e., he could not elevate his right foot. Metros had surgery to repair his foot, but still had a limp. He sustained a pelvic and hip fracture in that accident which resulted in the need for multiple hip replacement surgeries and revisions. In 1986, Metros refractured his hip when the wheel of his truck came off, causing him to crash. Metros was involved in lawsuits relating to the 1982 and 1986 accidents. In January 2002, Metros was rear-ended in his vehicle by a large utility truck and sustained an injury to his neck and shoulders, producing neck pain radiating to both shoulders and neck spasms. As a consequence, Metros complained of weakness in his right hand and headaches. X-rays at that time showed degenerative changes in his spine (at the fourth and fifth, and fifth and sixth vertebrae), and he was diagnosed with cervical strain and spasm. Metros complained of chronic right shoulder pain in March 2006. Sometime in 2007, Metros had a saw cut accident where he cut tendons and nerves in his left hand. In September 2007, Metros complained to his physician about his left knee and X-rays showed early signs of arthritis. Metros had weakness in his right shoulder and arm from a prior accident unrelated to the November 2007 accident. He had preexisting degenerative joint disease in his spine.

4

Metros did not testify at trial. He sought to prove he had suffered a traumatic brain injury resulting from the forces of the accident, as well as neck and shoulder injuries requiring surgery. Metros presented testimony from witnesses to the accident and various experts, including accident reconstruction and biomechanical engineering expert Jai Singh, orthopedic surgeon John Leslie Beck, clinical psychologist Arnold Purisch, Metros's treating chiropractor Robert Moulas, and neurologist Hyman Gross. Metros's wife also testified concerning Metros's physical complaints and the changes in his condition and personality after the accident.

Accident reconstruction expert Singh testified about mechanisms that would cause Metros injuries to his head, shoulder and neck based on the forces to his vehicle. He stated these mechanisms allowed for the left side of Metros's head to hit his car's padded side header panel with forces in the range of 42 and 59 g's, which was sufficient for head injury. Singh also opined there was a jamming mechanism in Metros's right shoulder socket, as if breaking a fall, and significant forward bending and neck compression from head contact, a mechanism for "axonal sheer injury" to Metros's brain and injury to Metros's neck at the sixth and seventh vertebrae. Singh testified that a left-sided head contact in the collision was consistent with Metros's right-sided head complaints at the hospital. Though Metros's postaccident X-rays and examinations of his shoulder and scalp were normal, Singh did not see that as inconsistent with the forces he described because it was a function of the padded surface Metros hit. Singh admitted that Metros's head and chest did not hit the steering wheel, and he was restrained by his seat belt. Singh agreed that a closed-head injury required an impact to the head; he admitted that

5

eight days after the accident Metros's treating physician in Georgia saw Metros and found no external signs of damage to Metros's head.

Orthopedic surgeon Beck opined Metros had incurred severe jaw injuries and hurt his neck between the sixth and seventh vertebrae, both shoulders, and left hand in the accident. Though he conceded the medical records did not indicate damage to Metros's jaw or that Metros had struck his head or face in the accident, Dr. Beck testified Metros had dislocated his jaw, causing severe headaches, and had temporomandibular joint syndrome. Dr. Beck also testified Metros suffered from chronic pain. Dr. Beck agreed the nature of Metros's cervical spine injury was "whiplash," that is, sprain and strain of the muscles and tendons in the neck area, and some decreased range of motion. He wanted to refer Metros to a jaw specialist for future treatment, and felt Metros required future neck and shoulder surgery costing between $180,000 and $265,000.

On cross-examination, Dr. Beck admitted that because he did not have all of Metros's medical records, he could not say to a reasonable degree of medical certainty that Metros's neck and shoulder injuries were received as a result of the November 2007 accident or preexisted the accident. Dr. Beck acknowledged Metros had normal range of motion in both shoulders. Though Dr. Beck related that an MRI of Metros's cervical spine taken several weeks after the accident showed a herniation or protrusion that was "small in size," he testified the bulge was insignificant "from a surgical standpoint" and it was not pressing on a nerve or compromising other structures.

Dr. Beck also conceded that the postaccident medical records did not show that Metros had lost consciousness or that he was going in and out of consciousness. Though

6

Metros had told him his seatbelt had broken and his head had slammed against the window of his car during the accident, Dr. Beck conceded his own report said nothing about Metros's head striking the window.

Chiropractor Moulas testified that a few days after the accident Metros complained of blurry vision, headaches, and pain in his neck, back, right shoulder, left chest, left arm and hand, right Achilles heel, right thigh, and middle finger. He testified Metros was slurring his speech. Dr. Moulas performed electric stimulation to Metros's neck and upper back on four occasions in November 2007. When Dr. Moulas took Metros's medical history, Metros did not report his chronic right shoulder problems, nor did he tell Dr. Moulas he had had surgery on his right Achilles tendon area to correct his drop foot. Metros did not report hitting his head on anything in the crash. Dr. Moulas admitted that Metros passed all of his cranial nerve and neurological tests, and that his head looked normal, without bruising, swelling, bleeding, abrasions or a knot. Dr. Moulas did not take X-rays or refer Metros for a neck MRI. He admitted Metros had suffered a cervical whiplash injury, as well as pains and strains of the muscles in his mid and low back.

Neurology specialist Gross testified that Metros suffered a complicated moderate traumatic brain injury, chronic cervical spine strain and pain, and soft tissue injury from a major impact. He believed Metros's complaints, his MRI's, and observations by Metros's work manager were consistent with a closed head traumatic brain injury called a diffuse axonal injury, or scarring of the nerve. He also testified Metros suffered an acute tear in his rotator cuff and two herniated disks after the accident. He testified Metros had

7

posttraumatic chronic bilateral shoulder pain, failed epidural steroid injections, and a failed right side arthroscopy due to the accident. Dr. Gross addressed Metros's future care: in his opinion Metros would need multiple medications for his pain, mood, and cognition issues; Botox injections for his migraine headaches; injections for pain; complicated cervical surgery; imaging studies; cognitive rehabilitation; marital counseling and neuropsychiatric visits; physical and occupational therapy; and appointments with an otologist for his hearing. He conceded, however, that Metros's treating physician in Georgia had stated he was not a candidate for neck surgery. He also admitted he had no way of knowing the age of Metros's nerve scarring and whether or not it preexisted the accident.

Clinical psychologist Purisch testified based on his review of medical information, and evaluation and testing of Metros, that Metros had suffered a mild to moderate right-sided brain injury and frontal lobe injury. However, Dr. Purisch admitted that nothing in the emergency room records indicated Metros had symptoms correlating with a right-sided brain injury. He conceded none of the postaccident hospital records described Metros as confused, agitated, repeating questions or disoriented, nor were there such descriptions within the hospital records from four days after the accident. Metros's CT scan taken four days after the accident was normal, and Dr. Purisch concluded he did not suffer any brain stem injury. Dr. Purisch admitted he was not provided with any of the

8

medical records from Metros's three prior motor vehicle accidents, nor did he ask for them to assess Metros.[1]

Defense counsel elicited that Dr. Purisch had neglected to list in his expert report a personality inventory questionnaire for Metros that had produced a significantly elevated "fake bad" scale. The results of that test indicated that Metros had "reported a much larger than average number of somatic symptoms rarely described by individuals with genuine medical conditions"; that his responses were "associated with noncredible reporting of somatic and/or cognitive symptoms" and they could reflect substantial medical problems or exaggeration. The doctor explained such results were consistent with someone with significant medical problems, and that Metros's personality put his psychological problems, which Metros underreported, into physical complaints. Dr. Purisch agreed that another test, Metros's personality assessment inventory, was inconsistent with his diagnosis of "cognitive disorder not otherwise specified."

Metros's experts Singh and Dr. Purisch observed that Metros had reported false information concerning the accident. Singh stated that Metros had reported to his primary care physician in Georgia that the collision caused his car to be pushed 100 yards down the street, which Singh would not expect. Metros also reported he was knocked

_____

[1]     Dr. Purisch also acknowledged that Metros had many stressors in his past, including the fact he was discharged from the Army shortly after having a psychiatric evaluation stemming from stress concerning his sick parents; his disability resulting from his motorcycle accident; a sister who had personality changes following a motor vehicle accident and head injury; a daughter who attempted suicide when she was a teenager, struggles finding work between 1985 and 2002; the fact he believed one of his former wives had plotted to kill him; and his belief his ex-wife had turned his daughter against him. Dr. Purisch agreed these played a role in Metros's psychological makeup.

through his seat restraints, which Singh said did not occur frontally, only somewhat laterally. Dr. Purisch admitted that Metros had previously reported untrue facts about the accident: that he had swelling of the brain, he was in a coma, that he had to be extracted from his car with the jaws of life, and that his car ended up 100 yards down the street. He posited that Metros was confused at the time, even though Dr. Purisch later admitted the ambulance attendants gave Metros a perfect Glasgow coma score (a measure of responsiveness) of 15. Dr. Purisch, however, felt in general that Metros downplayed his emotional problems and pain.

Defense expert Ted David Evans, a clinical psychologist, examined Metros regarding his claim of traumatic brain injury. He pointed out that the day-of-accident records showed Metros suffered no loss of consciousness, no posttraumatic amnesia, no confusion, no disorientation, and no abnormal neurological signs at the scene or in the emergency room. Dr. Evans noted that within minutes of the accident, Metros's Glasglow coma scale was 15 out of 15, and he was alert and oriented on all spheres, all of which was grossly inconsistent with Metros having lost conscious. He explained that if there is no posttraumatic amnesia, there is no brain injury, and that even considering Metros's deposition testimony, there was no evidence Metros suffered any brain injury as a result of the accident. According to Dr. Evans, Metros did not need cognitive, psychological, or neuropsychological care related to the accident, and his symptoms were consistent with malingering or a "litigation agenda." Dr. Evans observed that Metros's reporting of "fantastic tales" about his accident disadvantaged his medical doctors in Georgia.

10

Defense neurologist Barry Ludwig similarly testified that Metros did not sustain a traumatic brain injury as a result of the November 2007 car accident. He pointed out that according to the police, paramedic, nurse and doctor records, Metros did not lose or have any alteration in his consciousness and he had excellent recollection of the accident details in the emergency room, which meant he did not have a concussion, amnesia or period of confusion and thus no brain injury. There was no evidence that Metros hit his head or that there was a sudden deceleration and strike. Dr. Ludwig also testified that none of Metros's three MRI's after the accident showed evidence of brain injury (one was conducted three weeks after the accident and others over the course of the following months), nor did the CT scan of his brain conducted a couple of days after the accident. According to Dr. Ludwig, one of Metros's MRI's showed spots that were normal changes in persons over the age 60, not diagnostic of a brain injury. Dr. Ludwig did not believe there were signs of axonal sheering or scarring of the nerve cells. Dr. Ludwig testified that Metros's neurologist in Georgia had done an EMG test to ascertain nerve damage, and that test was negative.

Dr. Ludwig also testified Metros did not sustain a disk injury in his cervical spine as a result of the accident. He observed Metros's November 2007 MRI showed an extensive amount of severe, long-standing degenerative disk disease that predated the accident. Dr. Ludwig saw nothing in the MRI taken three weeks after the accident that was definitely due to trauma. He noted that Metros had diminished hearing and preexisting tinnitus; Metros explained his hearing issue was an old problem related to being in the Army. Dr. Ludwig found nothing in Metros's records that would provide a

11

neurological reason for his ongoing headaches. According to Dr. Ludwig, symptoms such as tinnitus, blurry vision, hearing loss, and slurred speech could be due to many conditions unrelated to brain injury.

Dr. Ludwig agreed Metros had suffered soft tissue injuries that at least initially warranted chiropractic treatment. However, he did not allow for future care for any reason related to Metros's injuries as a result of the accident. According to Dr. Ludwig, all of the future medical treatment that Dr. Gross was recommending, including neck surgery; behavioral, physical or occupational therapy; neuropsychological evaluations; and psychological, psychiatric, or neurological treatment, was not needed as a result of the accident, though Metros might need future medical care for other reasons.

Board certified orthopedic surgeon Alan Mark Strizak observed that Metros complained of neck pain without evidence of damage or harm to his neck, which meant he had whiplash associated disorder. An MRI done in Georgia 21 days after the accident did not show sprain or strain. Dr. Strizak confirmed that Metros's emergency room X-rays showed preexisting degenerative changes from the fourth to seventh cervical vertebrae; there was no evidence of acute fracture. He testified the degenerative changes in Metros's neck did not predispose him to more pain as a result of the accident. According to Dr. Strizak, the evidence did not support any current or anticipated future need for cervical spine surgery causally related to, aggravated by, or accelerated by injuries reasonably sustained in the accident.

As for Metros's shoulder, Dr. Strizak testified that while Metros's November 29, 2007 MRI showed some fraying in his right rotator cuff, it did not show anything that

12

could reasonably be attributed to something that happened 21 days earlier. Metros's left shoulder MRI was normal for his age. Dr. Strizak testified it was medically improbable that anything from the accident either caused or even aggravated or accelerated the need for right shoulder surgery. Nothing in the operative report of Metros's shoulder surgery showed anything indicating acute trauma that occurred as a result of the accident; all of it was of long-standing origin. Thus, according to Dr. Strizak, while Metros's shoulder surgery was reasonable and necessary, it was not causally related to, aggravated or accelerated because of anything done in the accident. Dr. Strizak testified it was consistent with Metros's history of chronic right shoulder complaints.

Dr. Strizak addressed what he believed was Metros's medically necessary treatment. He testified the necessary treatment included the initial treatment and transportation by the emergency medical technicians, EMT treatment, and the day-of-accident evaluation and treatment, including X-rays and imaging studies. He testified only two of the first four visits to Metros's chiropractor were recommended. Metros received services at St. Jude Medical Center on November 12, 2007, but only some of those services were related to the accident. Metros sought care from his primary care provider, Dr. Hart, and those visits were medically necessary through April 1, 2008, and related to the accident, including a referral for MRI studies for Metros's cervical spine and shoulders. Metros had 25 sessions of physical therapy, including electrical stimulation, for his neck and right shoulder from January 21, 2008, to June 12, 2008. According to Dr. Strizak, this treatment was appropriate for someone with whiplash to manage their pain, but only the first 12 physical therapy visits were medically necessary

13

and related to the accident. Dr. Strizak testified that Metros would not require any future orthopedic care or treatment to treat the effects of the accident, disagreeing with Dr. Gross's conclusions.

At the close of the defense case, counsel read from Metros's deposition in which he denied that he injured his lower back or left shoulder in the November 2007 accident. Counsel also read from Metros's interrogatory responses from July 2009 in which he denied having complaints or injuries involving the same parts of his body claimed to have been injured in the accident; answered "not applicable" when asked to list all physical, mental or emotional disabilities he had immediately before the accident; denied sustaining injuries of the kind for which he was claiming damages at any time after the accident; and denied filing any action or making a written claim for compensation for personal injuries in the past ten years other than for the November 2007 accident. Metros's counsel read another excerpt from Metros's deposition where Metros testified that he lost consciousness in the November 2007 accident and denied telling paramedics that he hurt his left shoulder.

Outside of the jury's presence, the parties stipulated that Metros's recoverable past medical expenses were $21,386.91. They agreed the special verdict form would not reflect or address those expenses, and that the jury would be told only that Metros had

14

incurred an agreed-upon amount of past medical expenses and they would not have to decide that issue.[2]

By special verdict, the jury found that Chowdhary's negligence was "a substantial factor in causing harm to . . . Metros." By a 10-2 verdict, it found zero damages in past pain and suffering. It unanimously found zero damages in future medical expenses and future pain and suffering.

Metros moved for a new trial in part on grounds the jury awarded inadequate damages and engaged in misconduct, and error in law had occurred at trial. In part, Metros argued the record was "replete" with evidence that he suffered significant brain injury as well as multiple orthopedic complications, and that the accident necessitated his right shoulder surgery. Chowdhary responded by pointing out he had disputed Metros's allegation of traumatic brain injury, disputed causation of the shoulder surgery and cervical epidural injections, and presented evidence of a long medical history of serious injuries preexisting the accident. According to Chowdhary, Metros had not proved his damages. He also argued that Metros, who did not testify, was severely impeached during trial and presented limited medical records, and thus the jury had no way to evaluate his pain and suffering but could conclude he had exaggerated the accident and his injuries to his treating providers and experts.

---

[2]     The parties do not point to any record citation for what the trial court actually told the jury about Metros's past medical expenses. The jury instructions were not reported and are not contained in the appellant's appendix.

The trial court denied Metros's motion.3  Metros appeals the court's order.

DISCUSSION

I. *Claim of Inadequate Damages*

Metros contends the jury's verdict awarding him no future medical expense or pain and suffering damages is inadequate as a matter of law.  He maintains this conclusion follows because Chowdhary stipulated to liability and Metros presented evidence that he incurred some medical expenses as a result of Chowdhary's negligence.  Analogizing this case to *Dodson v. J. Pacific, Inc.* (2007) 154 Cal.App.4th 931 (*Dodson*), *Clifford v. Ruocco* (1952) 39 Cal.2d 327, and *Haskins v. Holmes* (1967) 252 Cal.App.2d 580, Metros argues he is entitled to a new trial on the matter.  Metros further argues the evidence that he suffered traumatic brain injury confirms the damage award's inadequacy; that the defense expert opinions were based on false or nonexistent facts and ignored the testimony of the lay witnesses to the accident.  According to Metros, "Had Drs. Ludwig

_____

3      In part, the court ruled:  "There was expert and percipient evidence both for and against actual injuries sustained by [Metros]; the need for future medical treatment; future pain and suffering; and causation of [Metros's] injuries.  However, there was evidence that the Plaintiff did sustain some injury in the accident. . . . [¶] . . . [¶] CACI instruction [No.] 3905A, which was given indicates that the jury must use its judgment to decide a reasonable amount based on their common sense. . . . [¶] . . . [¶] . . . Metros did not testify but was severely impeached through the introduction of his answers to interrogatories where he denied all prior injuries.  Also, there was the testimony of defense experts who pointed out significant exaggerations and fabrications in . . . Metro[s's] histories given to various doctors. . . . Metros did in fact have significant prior injuries.  [¶]  Thus, the jury was not given testimony from [Metros] himself, no amount for actual medical charges, and almost no medical records.  Also, [Metros's] experts did not testify to any surgical or other severe treatment that [Metros] had undergone.  [¶] . . . [¶]  The Court . . . can see from the evidence that a reasonable jury using its[ ] common sense, with this evidence, could award zero . . . ."

16

and Evans been informed of the testimony of [the accident witnesses], they, too, would have testified that [Metros] suffered a mild [traumatic brain injury]."

A. *Standard of Review*

Code of Civil Procedure section 657 provides in part: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the [trial] court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

"The question as to the amount of damages is a question of fact. In the first instance, it is for the jury to fix the amount of damages, and secondly, for the trial judge, on a motion for a new trial, to pass on the question of adequacy. Whether the contention is that the damages fixed by the jury are too high or too low, the determination of that question rests largely in the discretion of the trial judge. The appellate court has not seen or heard the witnesses, and has no power to pass upon their credibility. Normally, the appellate court has no power to interfere except when the facts before it suggest passion, prejudice or corruption upon the part of the jury, or where the uncontradicted evidence demonstrates that the award is insufficient as a matter of law. In determining whether there has been an abuse of discretion, the facts on the issue of damage most favorable to the respondent must be considered." (*Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 645.)

17

Thus, in assessing a challenge to evidence supporting a jury's damage awards, we are normally "bound by the familiar and highly deferential substantial evidence standard of review. This standard calls for review of the entire record to determine whether there is any substantial evidence, contradicted or not contradicted, to support the findings below. We view the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor." (*People ex rel. Brown v. Tri–Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567.)

Here, Metros does not rely on the sufficiency of the evidence standard of review. His challenge is necessarily based on Chowdhary's concession of liability and the theory that the relevant facts as to damages are uncontested: that the verdict of zero noneconomic damages is insufficient as a matter of law because it was uncontradicted at trial that he incurred medical expenses due to Chowdhary's negligence. We examine the cases that Metros asserts support that position.

B. *Authorities*

In *Dodson v. J. Pacific, Inc.*, *supra*, 154 Cal.App.4th 931, the plaintiff was injured when he fell running away from a large piece of scrap metal that the defendant's employees were loading onto his truck. (*Id*. at p. 932.) He was eventually diagnosed with some degenerative disease of his neck, a central disk rupture, spinal cord compression and bruising, and weakness in his extremities as a result of a spinal cord injury. (*Id*. at p. 934.) The plaintiff underwent surgery to remove the herniated disk and arthritic joints and to insert a metal plate. (*Ibid*.) He sued and at trial his expert opined his spinal cord injury and surgery resulted from the accident. (*Ibid*.) The defense experts

18

disputed that conclusion. (*Ibid*.) The jury found the defendant was negligent and its negligence caused plaintiff's injuries. (*Id.* at p. 935.) It awarded the plaintiff $16,679 in economic damages for his medical expenses, but no compensation for noneconomic injury or pain and suffering. (*Ibid*.)

The appellate court made clear that courts on the question had stated "an award that does not account for pain and suffering is 'not necessarily inadequate as a matter of law' [citation] and that '[e]very case depends upon the facts involved.' " (*Dodson*, *supra*, 154 Cal.App.4th at p. 936, citing *Miller v. San Diego Gas and Electric Co.* (1963) 212 Cal.App.2d 555, 558 (*Miller*).) However, it narrowly held under those particular circumstances, the jury's verdict for zero noneconomic damages was inadequate as a matter of law: "We hold that where a plaintiff had undergone surgery in which a herniated disc is removed and a metallic plated inserted, and the jury has expressly found that defendant's negligence was a cause of plaintiff's injury, the failure to award any damages for pain and suffering results in a damage award that is inadequate as a matter of law." (*Dodson*, 154 Cal.App.4th at p. 933.) Reviewing authorities, the court explained that by its special verdict the jury had resolved "factual conflicts [that] may justify the jury's failure to award non-economic damages—whether the plaintiff received any substantial injury or suffered any substantial pain; whether medical treatment was actually given or was given as a result of the injuries; and whether the medical treatment was reasonable or necessary . . . ." (*Id*. at p. 937.) It stated "we know—because the jury expressly decided—that [the defendant's] negligence was a cause of [plaintiff's] injury, and that [plaintiff] suffered economic damages 'caused by the accident . . . .' We know

19

that he underwent surgery in which a herniated disc was removed and replaced with a metallic plate. We know the jury awarded damages, at least in part, for [plaintiff's] surgical expenses. A plaintiff who is subjected to a serious surgical procedure must necessarily have endured at least some pain and suffering in connection with the surgery. While the extent of the plaintiff's pain and suffering is for the jury to decide, common experience tells us it cannot be zero." (*Dodson*, at pp. 937-938.)

In part, *Dodson* relied on the reasoning of *Miller*, *supra*, 212 Cal.App.2d 555. There, the plaintiff suffered an electric shock resulting from an electric company's negligence, and claimed "severe and permanent injuries," including blistering and discoloration of her arm as well as "nervous and mental damage." (*Id*. at p. 556.) She presented evidence that she was hospitalized and that her total medical bills were $1,133.18. (*Id*. at p. 557.) The defendant stipulated to those expenses, but seriously disputed the extent of her claimed injuries; it "expressly refrained from stipulating that the expenses were reasonable or that they were for treatments rendered necessary by reason of the negligence of the defendant." (*Id*. at p. 558.) The jury returned a verdict against the company for the exact amount of the medical bills. (*Ibid*.)

On appeal, the *Miller* court upheld the trial court's denial of a new trial, rejecting the plaintiff's contention that the verdict was inadequate as a matter of law. (*Miller*, *supra*, 212 Cal.App.2d at p. 562.) Though the court stated that a verdict for solely medical expenses would be inadequate where "the right to recover was established and that there was also proof that the medical expenses were incurred because of defendant's negligent act," at the same time it emphasized, "It cannot be said . . . that because a

20

verdict is rendered for the amount of medical expenses or for a less amount the verdict is inadequate as a matter of law. Every case depends upon the facts involved." (*Id*. at p. 558.) In *Miller*, there was highly conflicting evidence of the extent of plaintiff's injuries; the defendant had presented evidence that she falsified her injuries and physicians testified there was nothing to indicate an electric burn, charring, or atrophy. Having examined the records, the appellate court stated, "[W]e are compelled to conclude that there was a substantial conflict as to whether plaintiff received any substantial injury and as to whether bills incurred for medical examinations and treatment were rendered necessary by reason of the shock or whether they were necessary at all. The evidence would here amply support a finding that plaintiff received no injury whatever. It is not for this court to weigh the evidence. Our province goes no further than a determination that there was substantial evidence to support the verdict. Faced by this conflict in testimony and with evidence that there was negligence on the part of the defendant, it seems entirely probable that the jury felt that although plaintiff was entitled to no more than nominal damages, the kindest disposition of the case was to award to her an amount at least equivalent to her medical bills. Obviously the trial court so appraised the situation and permitted the judgment to stand." (*Id*. at p. 260.)

In *Haskins v. Holmes*, *supra*, 252 Cal.App.2d 580, the court held that " '[w]hen a verdict has been returned for the exact amount of special damages in a case where substantial general damages were obviously incurred, and where a strong case of negligence has been made, a denial of a new trial by the trial court must be held an

21

abuse of discretion and a judgment on a verdict in an insufficient amount may not be affirmed.' " (*Id*. at p. 587.) *Haskins* involved an assault and battery in which there was no issue as to liability and it was undisputed that the plaintiff had suffered a fractured cheek and jaw bones. (*Id*. at p. 585.) Acknowledging the trial judge's findings, the court stated, "If [plaintiff's] injuries were sufficiently 'severe' (as found by the trial judge . . . ) as to require the surgical, medical and hospital care in the amount found . . . , it is patently obvious that necessarily and inevitably accompanying such injuries, surgery, and medical and hospital care were substantial pain, suffering, shock and inconvenience." (*Id*. at p. 585.)

In *Clifford v. Ruocco*, *supra*, 39 Cal.2d 327, the evidence established "without contradiction" that as a result of a car accident caused by the defendant's negligence the plaintiff suffered a scalp laceration, bruises, and a painful infection in her thigh, requiring an incision and draining of the wound, and the need for a future surgery. (*Id*. at p. 329.) She was confined to a hospital for 24 days and "experienced a considerable amount of pain and inconvenience for a year before the case came to trial, and . . . [was] likely to continue to suffer for some time in the future." (*Ibid*.) Under those circumstances, where plaintiff incurred expenses of $1,159.42 for medical services, and the cost of a future operation was estimated at $300, the jury's award of $1,500 was inadequate as a matter of law and the plaintiff was entitled to a new trial on all issues. (*Id*. at pp. 329-330.)

In *Dodson*, *Haskins*, and *Clifford*, the verdict awarding only special damages was held inadequate as a matter of law where the evidence made clear that substantial general damages "obviously" or "necessarily" resulted from surgical medical treatment, or pain

22

and suffering "inevitably accompanied" the type of injury incurred. Other cases reflect similar outcomes. (See *Wilson v. R.D. Werner Co.* (1980) 108 Cal.App.3d 878, 883 [reversing verdict awarding a plaintiff nothing for his pain and suffering and new trial granted where the evidence of the plaintiff's pain and suffering was "uncontroverted"; he required surgery, physical therapy, and his arms were immobilized in casts for about three months].) To the contrary are cases as *Miller*, *supra*, 212 Cal.App.2d 555 in which the evidence is highly contested, and there is some indication the injuries are insubstantial, preexisting, or falsified. (See *Whyatt v. Kukura* (1958) 157 Cal.App.2d 803, 805 [verdict of $750 for the plaintiff in a rear-end accident did not warrant a new trial where plaintiff sustained whiplash type injuries and plaintiff had a history of preexisting conditions including ulcer, high blood pressure and arthritis, doctors testified that any condition of spurring or irritation in her spine was not caused by the accident, no muscle spasm was found and X-rays were normal except for preexisting arthritic changes; "[c]learly the evidence was such . . . that the jurors might very reasonably have believed . . . that plaintiff's physical disabilities, as well as the various items of expense which made up her claim of special damages, were chargeable very largely to preexisting causes"]; *Kraut v. Cornell* (1959) 175 Cal.App.2d 528, 530-533 [award of $300 for plaintiff in rear-end accident was not inadequate as a matter of law where there was conflicting medical evidence of plaintiff's injuries, the jury was free to reject plaintiff's uncontradicted testimony as self-interested and subjective, and the jury was entitled to come to the conclusion that plaintiff's aches and pains were largely due to his previous physical condition and not injuries received in the accident; "it cannot be said as a matter

23

of law that the award was inadequate, for it is patent that the jury was not convinced plaintiff had sustained his burden of proof that the ills he described were all caused by defendant's negligence"]; *Avery v. Watje* (1967) 253 Cal.App.2d 660, 662 [$2,000 verdict for injuries sustained in rear-end accident not inadequate where plaintiff suffered prior accidents with similar injuries, had a congenital low back and had back problems, the impact was "slight" and the plaintiff did not complain of pain at that time; "the jury's verdict and judge's determination to allow it to stand were well within the bounds of reasonableness" and they "might well have . . . felt that the accident in question had no substantial effect on plaintiff's low back condition by reason of its prior existence, and the other injuries"].)

C. *Analysis*

We do not draw from *Dodson* and *Miller* a bright line rule that noneconomic damages must be awarded where a defendant concedes liability, and there is evidence a plaintiff has incurred medical expenses due to the defendant's negligence. The foregoing authorities instead require us to examine the evidence in total to ascertain the type and nature of medical treatment Metros underwent, and whether the evidence suggests Metros *necessarily* or *inevitably* incurred pain and suffering in connection with that treatment as in *Dodson*, or whether, as in *Miller* and *Whyatt*, the evidence was highly disputed as to not only the nature and extent of Metros's injuries, but also whether they resulted from the accident or from preexisting medical conditions.

The circumstances here are akin to *Miller* and *Whyatt* in that Chowdhary presented abundant contrary evidence from which the jury could conclude Metros did not suffer a

24

traumatic brain injury or any other significant injury, much less an injury requiring painful medical treatment such as surgery, in connection with the accident. In making its final determination as to damages, the jury had the power to give whatever weight it chose to the evidence. (*San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 931.) The jury was entitled to accept the testimony of Drs. Evans and Ludwig that Metros did not suffer a brain injury in the accident. It was entitled to accept Dr. Strizak's opinion as to Metros's reasonable medical treatment caused by the accident and conclude that his treatment—Metros's initial transportation and emergency room treatment, various examinations and diagnostic studies, two chiropractic sessions of electronic stimulation, and several physical therapy sessions to treat his soft tissue injuries—did not obviously or inevitably result in appreciable or compensable pain and suffering. It was also entitled to conclude, in view of Metros's prior accidents and injuries—including his preexisting degenerative disease in his cervical spine and right shoulder condition, that any claim by Metros of pain and suffering, or his need for shoulder surgery or any future medical care, was attributable to those preexisting conditions. Such a conclusion was fully supported by the evidence, including Dr. Strizak's testimony that Metros's shoulder surgery was not causally related to or accelerated by the accident.[4] (Accord, *Miller*, *supra*, 212 Cal.App.2d at p. 560; *Whyatt v. Kukura*, *supra*, 157 Cal.App.2d at p. 805.)

---

[4]     Metros points out Dr. Strizak testified that "when someone is involved in a motor vehicle accident and they complain of whiplash, we think it appropriate to try to manage their pain and return them as quickly as possible to their normal life. So, for the

25

Further, the jury reasonably questioned Metros's credibility. The results of Dr. Purisch's personality testing permitted it to conclude Metros had exaggerated his claims of injury and their extent, and it plainly accepted the undisputed evidence that Metros had reported false information to his physicians concerning the accident, negatively affecting his credibility as a whole. The fact Chowdhary stipulated to liability, and defense experts agreed that Chowdhary's negligence caused Metros to incur some injury requiring medical treatment, does not eliminate the jury's obligation to determine the *nature and extent* of Metros's injuries and what medical treatment was or was not necessary, and assess Metros's credibility on those issues. It was the jury's role to assess the extent of Metros's damages, and we will give great weight to its determination as well as the trial court's on a new trial motion, upholding those decisions wherever reasonably possible. (*Torres v. City of Los Angeles* (1962) 58 Cal.2d 35, 53.)

We are unpersuaded by Metros's argument that the testimony of defense experts Drs. Ludwig and Evans was "totally incompetent" because they were not presented with the accident witnesses' testimony and thus "ignored the acute injury characteristics (loss of consciousness) suffered by [Metros] in the eight minutes immediately preceding the accident." The flaw with this argument is that the witnesses to the accident—both lay persons who were not shown to have any medical training—did not testify that Metros

complaints he has after the accident, it's appropriate to provide treatment." Though Dr. Ludwig agreed Metros had suffered soft tissue injuries, Dr. Strizak made clear that Metros's postaccident MRI in Georgia did not show sprain or strain. Dr. Strizak's generalization about individuals with whiplash did not require the jury to conclude Metros necessarily suffered a compensable amount of pain in connection with the soft tissue injuries he suffered in the accident.

had lost consciousness. One simply reported that after the accident he saw Metros with his eyes closed and his head slumped, and the other reported that four or five minutes after the accident Metros responded to her question if he was okay. That the latter witness also described Metros as confused and disoriented, "kind of looking like the moment was not good for him" is not necessarily evidence of loss of consciousness or head injury, and the jury could reasonably conclude such a condition is typical of anyone who is involved in a motor vehicle accident of the type in this case. In short, the lay witnesses' testimony did not prove Dr. Ludwig or Dr. Evans false, or unequivocally establish that Metros had lost consciousness, and both doctors would have been entitled to reject any such inference in view of the undisputed medical evidence that Metros had not lost consciousness in the accident but was alert and oriented afterwards, and that his emergency room examination and imaging studies were normal. Indeed, both Dr. Ludwig and Dr. Evans testified that evidence of what the lay witnesses to the accident saw would not make a difference in their conclusions.

Thus, the jury's verdict of zero past and future general damages, and zero future medical expenses, is fully justified by the evidence, which was highly disputed as to not only the nature and extent of Metros's injuries, but whether they resulted from the accident or from preexisting medical conditions. We cannot conclude as a matter of law that the evidence presented to the jury required them to award any greater amount.

27

## II. *Claim of Juror Misconduct*

### A. *Legal Principles and Standard of Review*

A trial court is authorized to grant a new trial on grounds of "[i]rregularity in the proceedings of the . . . jury . . . by which either party is prevented from having a fair trial" as well as "[m]isconduct of the jury." (Code Civ. Proc., § 657, subds. 1 & 2; see *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633; *Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1227.)

This court will not reverse a trial court's decision to deny a new trial alleging juror misconduct unless, on a review of the entire record, the court has abused its discretion. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859; see *People v. Dykes* (2009) 46 Cal.4th 731, 809; *Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1213; *Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 59; *ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832 ["When the court has denied a motion for new trial . . . we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion."].) Otherwise, we scrutinize the trial court's determinations underlying its new trial order under the test appropriate for such determination. (*Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th at p. 859.)

When evaluating a new trial motion based on juror misconduct, the trial court undertakes a three step process. (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.) It must first " 'determine whether the affidavits supporting the motion are admissible. [Citation.]' [Citation.] This, like any issue of admissibility, we review for abuse of

discretion. [Citation.] [¶] Second, 'If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.]' [Citation.] 'The moving party bears the burden of establishing juror misconduct.' " (*Ibid*.) " ' "[W]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]" ' [Citations.] [¶] ' "Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial." [Citation.]' [Citation.] On appeal, this court reviews the entire record, including the evidence, and makes an independent determination as to whether the misconduct was prejudicial." (*Ibid.*; see also *People v. Hajek* (2014) 58 Cal.4th 1144, 1249; *Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 508.)

"Juror misconduct raises a presumption of prejudice, and unless the prevailing party rebuts the presumption by showing the misconduct was harmless, a new trial should be granted. [Citations.] This does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside." (*Enyart v. City of Los Angeles*, *supra*, 76 Cal.App.4th at p. 507.) Where it is reasonably probable that in the absence of misconduct the jury would have arrived at a different verdict, the moving party is entitled to a new trial. (*Id*. at p. 508.)

B. *Evidence Presented and the Trial Court's Ruling*

In support of his assertion of juror misconduct, Metros provided affidavits from jurors Jennie Kendrick and Deborah Lafrenz. Kendrick averred that during deliberations,

29

"there were discussions about the [*sic*] whether or not [ ] Metros would benefit from an award of money, even though the majority of us thought it justified, since the expert witness costs were over $100,000." She stated, "Many of the jurors ultimately expressed an opinion that there was no reason to award money to Mr. Metros because it would only go to pay the experts. The majority of the jurors decided to award zero dollars for that reason." Juror Kendrick also averred that a juror who was a nurse told the jurors that she was familiar with EEG studies on brain damaged people and Metros's EEG would have detected brain damage if he had sustained it. According to Juror Kendrick, this juror told them that Metros's normal EEG meant he could not have brain damage, and a second juror, also a nurse, stated that the findings on Metros's MRI's were normal and would be found on all brain MRI's. Juror Kendrick also stated that a male juror "gave outside evidence to the jury regarding the forces involved in the collision that contradicted the expert testimony in the case." Specifically, she averred the male juror told the jury that he was familiar with the forces involved in car crashes from his knowledge of auto racing, and that Metros's expert was wrong when he testified that Metros experienced 50 g-forces during the collision, because such force would have killed him. Juror Kendrick stated: "This evidence seemed to have influenced a number of jurors on the issue of whether the collision involved forces that could have caused brain damage." Juror Lafrenz's declaration only addresses the male juror's comments about g-forces, and is identical to Juror Kendrick's.

In opposition, Chowdhary presented sworn statements of juror foreperson Jennifer Zamorano and juror Gina Miller. Both Zamorano and Miller stated that all of the jurors

30

had an opportunity to express their opinions about the evidence, and did not hear or see anything to indicate bias expressed by any juror for or against either party. Zamorano denied hearing any juror say Metros should or should not receive an award based on expert costs; that while costs were brought up, the jury was not influenced by it. She stated there were discussions about the g-forces and EEG's, but did not think they swayed any juror's mind. According to her, she reminded the male juror that his comments were not evidence, but the entire jury had already rejected Singh's conclusions about g-forces in any event. This was based on their own analysis of the expert's testimony, "not about Dale Earnhardt or car crashes or NASCAR or anything like that." Zamorano was asked whether, based on anything said about the medical evidence and specifically the EEG's or MRI's, there was any indication the jury decided the result based on someone's personal experience as opposed to the evidence. She responded: "I don't think it was personal experience. From what I remember, it was to the point where we all just sort of felt like one expert canceled out the other, and it just didn't—nothing seemed to make sense." Based on what Zamorano heard and saw during deliberations, she stated the jury's verdict was based on the evidence rather than outside information that may have been brought in.

Miller disagreed with the statements made by jurors Kendrick and Lafrenz as to misconduct; she stated she did not hear any juror say whether or not Metros should receive an award based on what they thought were the expert costs, she did not hear any male juror say Metros's expert was wrong based on his knowledge of car racing or hear any juror say this influenced their verdict, and she did not hear any juror say evidence should be disregarded based on what a nurse on the jury said about the MRI's. She did

31

not think anything influenced the jurors other than the trial testimony. According to Miller, the jurors discussed all of the expert testimony and decided Metros did not sustain brain damage.

The trial court sustained Chowdhary's objections to the substantive paragraphs of Kendrick's and Lafrenz's declarations on grounds they were speculative, lacked foundation and hearsay. Based on the Zamorano and Miller statements, it found there was no evidence to support a presumption of prejudice from juror misconduct.

C. *Analysis*

Metros contends he is entitled to a new trial because he established misconduct giving rise to a presumption of prejudice and Chowdhary presented no evidence rebutting the presumption. Specifically, he argues the juror declarations of Kendrick and Lafrenz were relevant and admissible in evidence, and showed three other jurors interjected their own specialized knowledge into the deliberations. Metros argues the juror declarations properly referred to overt acts or statements of other jurors, at least in part,[5] and consequently the trial court erred by sustaining Chowdhary's objections to those portions of the declarations. According to Metros, Chowdhary did not affirmatively rebut the

---

[5] Metros concedes the court properly sustained Chowdhary's objections to Kendrick's and Lafrenz's assertions that the jurors' remarks seemed to influence the other jurors. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1265 (*Steele*); Evid. Code, § 1150, subd. (a) ["Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.*"], italics added.)

32

evidence of misconduct by the male juror who discussed g-forces, and the record as a whole, particularly the fact Singh gave uncontroverted testimony concerning the potential for the collision to inflict serious injury and the jury's zero noneconomic and future medical damage verdict, confirms prejudice.

We accept those portions of Kendrick's and Lafrenz's declarations that report objectively ascertainable overt acts and statements of other jurors occurring within the jury room, as they are subject to corroboration. (*Steele*, *supra*, 27 Cal.4th at p. 1265; *Enyart v. City of Los Angeles*, *supra*, 76 Cal.App.4th at p. 508, fn. 6.) We nevertheless conclude the trial court did not err by ruling there was insufficient evidence of juror misconduct, or that if misconduct occurred, it was not prejudicial.

To the extent Metros claims misconduct relating to a discussion of expert costs somehow justifying a zero damage award, both Zamorano and Miller denied hearing any juror make the statements Kendrick assertedly heard, and the trial court plainly accepted Zamorano and Miller's declarations on that point. We will not disturb the court's credibility assessment on that issue. (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160; *Moore v. Preventative Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 743 [weighing credibility of conflicting declarations on a motion for new trial is uniquely within the trial court's province]; *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 108 [when an issue is tried on affidavits, appellate court will not disturb a determination of controverted facts based on substantially conflicting statements].)

33

As for Metros's claims concerning the male juror's and nurses' statements, it is true that a juror "should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (*In re Malone* (2011) 12 Cal.4th 935, 963 (*Malone*.)  However, "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work." (*Id.* at p. 963; see also *In re Lucas* (2004) 33 Cal.4th 682, 696 [jurors' knowledge and beliefs that they bring to deliberations may stem from education or employment, but sometimes comes from other personal experiences]; *Moore v. Preventive Medicine Medical Group, Inc.*, *supra*, 178 Cal.App.3d at pp. 741-742 ["Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself. Jurors are expected to be fully functioning human beings, bringing diverse backgrounds and experiences to the matter before them."].)

In *Steele*, *supra*, 27 Cal.4th 1230, the California Supreme Court stated, "[I]f we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer

34

to their background during deliberations. 'Jurors are not automatons. They are imbued with human frailties as well as virtues.' " (*Id*. at p. 1266.) There is, however, "[a] fine line . . . between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which . . . [is] misconduct." (*Ibid.*) Thus, "a distinction must be drawn between the introduction of new facts and a juror's reliance on his or her life experience when *evaluating* evidence." (*People v. Allen* (2011) 53 Cal.4th 60, 76.)

*Steele* involved a claim that jurors had engaged in misconduct by referencing their work experiences when assessing trial evidence during deliberations. The criminal defendant in *Steele* argued he suffered from psychological impairment resulting from his Vietnam war experience. His expert testified that the defendant's military records showed he was in the Navy and, while had not engaged in combat, he had received two weeks of training, including how to kill people with knives, at a SEAL counter-insurgency school. (*Steele*, *supra*, 27 Cal.4th at p. 1240.) The expert stated that the defendant may have had a trauma-inducing combat assignment not reflected in his official records. (*Ibid*.) The defendant also called physicians who had conducted a brain-mapping test to map the electrical activity of his brain, which showed various abnormalities in brain function. (*Id*. at p. 1241.) One doctor admitted such testing "was a fairly new technique" and that the control group for that system contained 16 people of defendant's age. (*Ibid*.) Another testified he believed use of the brain-mapping test was generally accepted in the scientific community for clinical use. (*Id*. at p. 1242.)

35

Following his conviction, defendant sought a new trial based in part on juror misconduct. (*Steele*, *supra*, 27 Cal.4th at p. 1260.) He provided juror affidavits indicating that four jurors had drawn on their military experience in assessing whether he had been exposed to combat in Vietnam. One juror stated that, based on his military experience, he did not believe the defendant had served in Vietnam "at a time when he might have been exposed to combat." (*Id*. at p. 1259.) Two other jurors stated they had attended the counterinsurgency SEAL school and had not been taught how to kill people. (*Ibid*.) Two other jurors "with medical experience" informed the jury that the criteria used by the doctors to establish the validity of the brain mapping test was " 'inadequate' based on 'what they ha[d] learned in their own experience in the medical field.' " (*Id*. at p. 1260.) The trial court denied the motion.

The Supreme Court affirmed, concluding there was no merit to defendant's assertion that the jurors committed misconduct by " 'the offering of expertise . . . , during deliberations, to help the jury as a whole to resolve key factual issues the case presented." (*Steele*, *supra*, 27 Cal.4th at p. 1260.) The Court explained that "extensive evidence was produced concerning the nature and extent of defendant's military training and Vietnam experience and its effect, if any, on his crimes, as well as evidence concerning the validity of [brain-mapping] testing. This evidence was susceptible of various interpretations. The views the jurors allegedly asserted here were not contrary to, but came within the range of, permissible interpretations of that evidence. All the jurors, including those with relevant personal backgrounds, were entitled to consider this evidence and express opinions regarding it." (*Id*. at pp. 1265-1266.)

36

We see little difference in the jurors' statements in this case from those in *Steele*. As in *Steele*, *supra*, 27 Cal.4th 1230, the male juror's statements concerning the consequence or effect of up to 50 g-forces did not introduce specific facts outside of the evidence, but constituted his personal evaluation and rejection of Singh's testimony based on his own knowledge and life experience. That juror was entitled to evaluate Singh's opinion in view of medical evidence showing Metros had not suffered any loss of consciousness, exhibit confusion, or have any overt head injury as a result of the accident, assess its credibility, and persuade the jury about his credibility determination. (See, e.g., *In re Lucas*, *supra*, 33 Cal.4th at p. 697 ["[A] juror's statement that a defendant's sole defense is not credible does not, of course, by itself constitute misconduct."].) And the record does not suggest that the male juror brought highly technical information before the jury, or held himself out as an expert. (*Ibid*.) All of the jurors heard the same medical evidence, and they considered Singh's testimony about the speed at which both cars were travelling in the collision, and could decide for themselves based on their own experiences the effect of the vehicle's impact.

In any event, neither declaration of Kendrick or Lafrenz shows that other jurors expressed any agreement with the male juror's assertions, and Zamorano's statement, which the trial court accepted, made clear that she reminded the jury during deliberations several times to reach their verdict based on the evidence presented during the case. The record falls short of showing that the male juror or any other juror decided the case based on anything other than the evidence presented. We reach the same conclusion as to the nurses' remarks concerning Metros's imaging studies, the results of which were examined

37

and testified to by both Metros's and Chowdhary's experts. We do not ascertain misconduct or resulting prejudice.

III. *Exclusion of Dr. Gross's Testimony Concerning Causation of Orthopedic Injury*

Metros contends the trial court prejudicially erred when it excluded the testimony of Dr. Gross as to whether the accident caused the damage in Metros's shoulder that needed surgery. He maintains that even though Dr. Gross specializes in neurology, he was qualified to give expert opinions on the treatment and evaluation of orthopedic injuries and the causation of those injuries, and his specialization should have only gone to the doctor's credibility. He further asserts that the substance of Dr. Gross's testimony was disclosed in his expert witness exchange. According to Metros, under *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, the fact Dr. Gross did not give these opinions in his deposition does not preclude him from giving them at trial as long as the substance of his testimony was disclosed in his expert exchange; it was defense counsel's obligation to elicit the information from him.

A. *Legal Principles as to Expert Disclosure and Standard of Review*

Any party may demand the exchange of expert witness information. (Code Civ. Proc., § 2034.210, subd. (a).) On such a demand, the responding party must disclose "the general substance of the testimony that the expert is expected to give." (Code Civ. Proc., § 2034.260, subd. (c)(2); see *Williams v. Volkswagenwerk Aktiengesellschaft* (1986) 180 Cal.App.3d 1244, 1257 (*Williams*).) "As interpreted by the California courts, this requires a party to 'disclose the substance of the facts and the opinions to which the expert will testify, either in his witness exchange list, or in his deposition, or both.' "

38

(*Williams*, at pp. 1257-1258, italics omitted; *Bonds v. Roy* (1999) 20 Cal.4th 140, 148; *Kennemur v. State of California*, *supra*, 133 Cal.App.3d at p. 919.)  If a party wishes to expand the scope of an expert's testimony beyond what is stated in the declaration, it must successfully move for leave to "[a]mend that party's expert witness declaration with respect to the general substance of the testimony that an expert previously designated is expected to give."  (Code Civ. Proc., § 2034.610, subd. (a)(2); see *Bonds v. Roy*, at p. 145.)

Thus, in *Bonds v. Roy*, *supra*, 20 Cal.4th 140, the defendant designated an expert with a declaration stating the expert would testify about damages, but at trial, sought to elicit testimony as to standard of care.  (*Id*. at pp. 142-143.)  The trial court would not permit it, and the California Supreme Court held it properly limited the scope of the expert's testimony to the general substance of what was previously described in the expert witness declaration.  (*Id*. at p. 149.)  In part, the court explained:  "[T]he very purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial.  This allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area.  'The opportunity to depose an expert during trial, particularly if the testimony relates to a central issue, often provides a wholly inadequate opportunity to understand the expert's opinion and to prepare to meet it.  [Citations.]'  [Citation.]  '[T]he need for pretrial discovery is greater with respect to expert witnesses than it is for ordinary fact witnesses [because] . . . .  [¶]  . . . the other parties must prepare to cope with witnesses possessed of specialized knowledge in some

39

scientific or technical field. They must gear up to cross-examine them effectively, and they must marshal the evidence to rebut their opinions.' " (*Bonds v. Roy*, at pp. 146-147.) "When an expert is permitted to testify at trial on a wholly undisclosed subject area, opposing parties . . . lack a fair opportunity to prepare for cross-examination or rebuttal." (*Id.* at p. 147.)

The trial court has a great deal of discretion when it comes to admitting expert testimony, and thus we review the court's admission of expert testimony for clear abuse of its discretion, looking to whether the court's ruling exceeds the bounds of reason, all of the circumstances before it being considered. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972; *Burton v. Sanner* (2012) 207 Cal.App.4th 12, 18; see also *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 778.) Even if the ruling is erroneous, however, it is not reversible absent a miscarriage of justice. (*Easterby*, at p. 783, citing Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*Easterby*, at p. 783.)

B. *The Trial Court Did Not Err by Excluding Dr. Gross's Opinions as to Causation of Metros's Shoulder Injuries*

Here, the trial court sustained Chowdhary's counsel's objections to Dr. Gross's opinion that Metros's damaged shoulder was caused by the accident, ruling such an opinion was beyond the scope of Metros's expert designation. In arguing for admission

40

of Dr. Gross's opinion, Metros's counsel read from Dr. Gross's expert designation, which stated he was "expected to testify as to the entire medical treatment of [Metros] *within his specialty*, and as to the nature and extent of [Metros's] injuries, resulting disabilities, medical treatment to date and reasonably anticipated to render in the future."[6] (Italics added.) Chowdhary's counsel argued the doctor's opinions were limited to his specialty in neurology and Metros's neurological deficits; that Metros had another orthopedic expert, Dr. Beck, whose testimony was not favorable; and Metros's counsel was simply trying to get a new opinion into evidence with Dr. Gross, his last expert witness. The trial court stated: "Unless [Dr. Gross's] designation was clear that he was going to testify to the shoulder issues and all other issues, then you'd say, 'Well, look at the designation,' but the designation is limited to his area of specialty. And if he didn't express an opinion [at his deposition], I won't let you go into that."

The trial court's ruling was not an abuse of its broad discretion, in view of the language of Dr. Gross's expert designation identifying his opinions as relating to Metros's medical treatment "within his specialty." This limitation, combined with the fact Metros had designated another expert, Dr. Beck, to testify concerning orthopedic injuries and care, compel us to conclude the trial court reasonably ruled Dr. Gross's designation did not give Chowdhary fair notice that he would testify about causation of Metros's shoulder

---

6    Dr. Gross's designation additionally provided: "Further, Dr. Gross will testify to the reasonableness and necessity of the medical treatment and medical billings rendered/incurred to date and the necessity of future medical care and cost thereof. Dr. Gross will further testify to the diagnosis and prognosis of the plaintiff's injuries. Dr. Gross is also expected to testify regarding the opinions of other experts and parties in this matter."

41

injuries, and Dr. Gross's proffered opinion was an expansion of the scope of his expert testimony that surprised the defendant.

Metros's arguments to the contrary are misplaced. He maintains the trial court ignored the fact that as a medical doctor, Dr. Gross was qualified to testify concerning his shoulder injuries and their cause. Metros relies on *Miller v. Silver* (1986) 181 Cal.App.3d 652, in which a psychiatrist with clinical surgery experience was held competent to testify about a plastic surgeon's negligence in failing to administer antibiotics. (*Id*. at pp. 659-661.) But this argument disregards the trial court's ruling, which was based on its interpretation of the scope of Metros's expert designation; whether Dr. Gross was qualified to give an expert opinion on the subject is of no import where the general substance of his proffered opinion was not fairly disclosed in the expert designation.

Metros further argues that *Kennemur v. State of California*, *supra*, 133 Cal.App.3d 907 establishes that the substance of Dr. Gross's testimony was disclosed and included both matters neurologic and medical issues not limited to neurology. He points out that at Dr. Gross's deposition, Chowdhary's counsel did not ask if the doctor had expressed all of the opinions he was going to give in the case, and asserts the trial court "penalized [him] for Respondent's failings." He relies on the statement in *Kennemur* that a party "must disclose either in his witness exchange list or at his expert's deposition, *if the expert is asked*, the substance of the facts and the opinions which the expert will testify to at trial." (*Id*. at p. 919, italics added.) But Metros misunderstands *Kennemur*. There, the trial court held the plaintiff's failure to comply with the expert designation requirements barred her from questioning an expert witness on a critical issue in that case. (*Id*. at pp.

42

912-915.) On appeal, the appellate court reasoned that this failure did not automatically bar the expert from testifying, as long as he had disclosed his opinion on the subject during deposition. The court reasoned a disclosure during deposition would render "the statutory noncompliance . . . harmless since [defendant] would have been afforded the opportunity to prepare for cross-examination and rebuttal of [the expert's] opinion." (*Id.* at p. 918, fn. 5.)[7]

Thus, the *Kennemur* court examined the expert's deposition to determine whether it afforded the defendants adequate notice of the expected substance of his trial testimony *only to see whether that deposition testimony rendered harmless the plaintiff's erroneous failure to disclose the substance of his testimony in her expert designation.* (*Kennemur v. State of California*, *supra*, 133 Cal.App.3d at pp. 918-920, & fn. 5.) Nowhere does *Kennemur* suggest that it is defense counsel's burden in an expert's deposition to elicit the breadth of the expert's testimony where a plaintiff does not adequately give notice of the substance of the experts' expected testimony in his or her expert designation. Contrary to Metros's suggestion in his arguments, the adequacy of a party's expert designation is the necessary predicate and basis of *Kennemur*'s holding. Here, the trial court concluded Dr. Gross's designation did not reasonably disclose the general substance of any opinions on causation of Metros's orthopedic injuries, thus depriving Chowdhary the opportunity to

---

7    In *Kennemur*, *supra*, 133 Cal.App.3d 907, the expert had testified at his various deposition sessions that he had no opinion to offer on the previously undisclosed issue. (*Id.* at pp. 912-913.) The defendant therefore "was entitled to rely on [the expert's] disclaimer [that he would not testify on the issue] until such time as appellant disclosed that [the expert] had conducted a further investigation and had reached additional opinions in a new area of inquiry." (*Id.* at p. 920.)

prepare for the expert's cross-examination and possible rebuttal or surrebuttal of his testimony. The court's ensuing exclusion of Dr. Gross's opinion was not an abuse of discretion under *Kennemur*.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.

44